CHARLES CASTONGUAY ET AL. *v.*
TODD PLOURDE ET AL.
(AC 16227)

O'Connell, Spear and Mulcahy, Js.

Argued March 20—officially released August 19, 1997

*John Rose, Jr.*, with whom was *Scott A. Bennett*, for the appellants (named defendant et al.).

*Dean B. Kilbourne*, for the appellees (plaintiffs).

*Opinion*

MULCAHY, J. The defendants appeal from the granting of an injunction prohibiting the continued construction of a house on land that abuts that of the plaintiffs. The trial court found that the design and location of the structure violated the provisions of a declaration of restrictions and covenants (declaration) recorded on the Bristol land records.

The defendants claim the trial court improperly concluded that (1) the plaintiffs were entitled to bring this action to enforce the terms and restrictions of the declaration, (2) the terms of the declaration protect the plaintiffs' panoramic view, (3) the plaintiffs' action for equitable relief is not barred by laches, and (4) the injury to the defendants resulting from the injunction is not greatly disproportionate to the injury complained of by the plaintiffs. The defendants also maintain that the trial court's order does not adequately delineate the rights and obligations of the parties. We affirm the judgment of the trial court.

The following facts are germane to this appeal. The parties are owners of residential properties in Cider Mill

Estates, a thirty-four lot subdivision located in Bristol. Lornik, Inc. (Lornik), the original owner and developer of Cider Mill Estates, acting through its president, Robert J. Tabacco, executed and recorded the declaration on June 24, 1986.[1] The declaration refers to lots enumerated on a recorded subdivision map dated February 28, 1986.

The subdivision is located on an expansive hillside affording property owners a commanding easterly view of the Hartford skyline and the surrounding countryside. Within the subdivision, Old Cider Mill Road is to the east of Hill Street, the latter running in a generally north-south direction. The plaintiffs Charles Castonguay and Susan Castonguay are the owners of lot twenty-seven, and the plaintiffs Peter Howard and Lois Howard are the owners of lot 28. Both properties front on the east side of Hill Street. At all relevant times, the plaintiffs have resided in homes constructed on their respective lots. The defendants, Todd Plourde and Cheri LeClair, are the owners of lot 9, which is located directly east of, and abutting, lots 27 and 28.[2] The plaintiffs' lots drop off to the east, with their rear boundaries being approximately seventeen feet below the frontage on Hill Street.

The Castonguay house was constructed on lot 27 by Charles Castonguay's father, Louis Castonguay, in 1987. Charles Castonguay purchased the property from his father in 1993. The Howards purchased lot 28 from Lornik in 1987 and constructed their home on the lot shortly thereafter. The deeds through which the plaintiffs obtained title recite that the conveyed premises are

[1] Lornik, a defendant in the action before the trial court, is not a party to this appeal. When reference is made hereinafter to the plaintiffs, we are referring to Charles Castonguay and Susan Castonguay and Peter Howard and Lois Howard. We refer to Todd Plourde and Cheri LeClair as the defendants.

[2] Lot 9 is entered from Cider Mill Road by a driveway running between lots 8 and 10.

"subject to a Declaration of Restrictions and Covenants from Lornik, Inc., dated June 24, 1986 and recorded in the Bristol Land Records." The defendants purchased lot 9, as unimproved land, on November 8, 1995, from Bristol Financial Service, which had obtained title via a bank foreclosure. It is undisputed that all properties involved in this appeal are subject to the terms of the declaration and that the defendants had notice of the restrictions.

The declaration contains a number of restrictions and requirements. Paragraph twenty of the declaration provides: "Location of dwelling house, garage and any other buildings or additions to buildings to be erected on any lot shall be subject to written approval of Lornik, Inc., or its successors or assigns, in order to preserve the view of other lot owners." The plaintiffs allege that the defendants are building on lot 9 a "very high" two story structure that obstructs their view in violation of the declaration.

The trial court's conclusions were based on the evidence presented and after an on-site viewing of the entire area. It found that the general layout of the subdivision and the location of the houses on Hill Street and Cider Mill Road were intended to take full advantage of the "grand panoramic view." Further, the court found that the houses on Old Cider Mill Road were all built far enough below those on Hill Street to preserve for Hill Street residents a view from their first and second floors over the roofs of the houses below and to the east.

The trial court also found that an important consideration of the plaintiffs in the purchase of their properties was enjoyment of the view to the east, and that, in reliance on the terms of the declaration, they went to considerable expense in the design and construction of their homes so as to maximize enjoyment of that

view. The Castonguay house has large glass doors opening on two levels of decks, providing an easterly view from various rooms, as well as from their decks. Louis Castonguay, when building his house, was aware of the restrictions and discussed with Tabacco the need for a low roof on any future lot 9 house. The Howard home is a contemporary design with angles specially built into the structure to allow full advantage of the easterly view. Peter Howard, before purchasing lot 28, discussed lot 9 with Tabacco, receiving assurances that whatever was built would not substantially impede the view. The Howards, aware of the restrictions, would not have purchased lot 28 if they believed their view could be obstructed.

Prior to commencing construction, the defendants met with Tabacco on two occasions, once in April and again in May, 1996. At the first meeting, Plourde had the plans for the house, but not the plot plan. On the second occasion, Tabacco was shown a plot plan dated March 6, 1996; Lornik, through Tabacco, approved in writing the plan, specifications and location of the defendants' house.[3]

At one point, Charles Castonguay, noticing activity on lot 9, went over to visit the defendants for the purpose of meeting them. The defendants were roughly staking out their prospective house. The meeting was cordial and brief, without any discussion of the design or height of the future structure. At a second visit to lot 9, on March 24, 1996, Charles Castonguay briefly looked at one or two pages of the defendants' building plans while the parties engaged in light conversation.

---

[3] Regarding Lornik's written approval, the trial court's memorandum of decision states: "The plan approved is undated and therefore not in form appropriate for recordation as required by paragraph three of the declaration of restrictions. The plot plan which is part of Exhibit A, showing the location of the Plourde/LeClair house is signed by Robert Tabacco, President of Lornik but the approval is undated."

Construction of the defendants' home began in May, 1996. It advanced to the framing of the full house, including its "bowed roof." The trial court's memorandum of decision describes the house as a "very high" structure, the peak of its "bowed roof" approximately thirty and one-half feet above the level of the land, having an attached garage, which is a full two stories, approximately twenty-five and one-half feet in height.

On June 12, 1996, when the initial roof rafters were being placed, and the unusual height of the roof became apparent, the plaintiffs filed this action for equitable relief. The trial court enjoined the defendants "from continuing to build the house on lot 9 which is now under construction, and from building any house on said lot which will unduly restrict the panoramic view of the plaintiffs."[4]

I

The defendants first contend that the restrictions contained in the declaration are not appurtenant. The defendants do not contest the existence of the general development scheme. Instead, they argue that because a third party's approval was required, the restrictions were not enforceable as to them but, if against anyone, only against the third party. Their claim is that the covenant is personal to Lornik and cannot be enforced by other grantees because it does not run with the land. We disagree.

Established principles guide our determination of the appropriate scope of review of this claim. To determine whether the restrictions contained in the declaration are appurtenant, we must interpret the language of the

[4] The trial court also enjoined Lornik "from approving any plans or specifications and the location of any building on lot 9 that would unduly restrict the panoramic view of the plaintiffs." Lornik has not appealed the order of the trial court.

creating instrument. The meaning and effect of the language are to be determined by the intent of the parties as expressed in the deed. See *Kelly* v. *Ivler*, 187 Conn. 31, 39, 450 A.2d 817 (1982); *Taylor* v. *Dennehy*, 136 Conn. 398, 402, 71 A.2d 596 (1950). The determination of the intent behind language in an instrument of conveyance, "considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is plenary. . . . We are thus unconstrained by the trial court's legal conclusion as to intent." (Citations omitted; internal quotation marks omitted.) *Dean* v. *Riley*, 31 Conn. App. 87, 92, 623 A.2d 521 (1993); see *Lago* v. *Guerrette*, 219 Conn. 262, 267–68, 592 A.2d 939 (1991); see also *Hare* v. *McClellan*, 234 Conn. 581, 593–94, 662 A.2d 1242 (1995); *Carbone* v. *Vigliotti*, 222 Conn. 216, 222, 610 A.2d 565 (1992); *Kelly* v. *Ivler*, supra, 39; *Contegni* v. *Payne*, 18 Conn. App. 47, 51, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989); *Marion Road Assn.* v. *Harlow*, 1 Conn. App. 329, 332, 472 A.2d 785 (1984).

"For a determination of the character and extent of an easement created by deed we must look to the language of the deed, the situation of the property and the surrounding circumstances in order to ascertain the intention of the parties. . . . The language of the grant will be given its ordinary import in the absence of anything in the situation or surrounding circumstances which indicates a contrary intent. . . . The meaning and effect of the reservation are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . ." (Citations omitted; internal quotation marks omitted.) *Lago* v. *Guerrette*, supra, 219 Conn. 267–68; see also *Pulver* v. *Mascolo*, 155 Conn. 644, 649, 237 A.2d 97 (1967).

A reservation in a covenant will be interpreted as appurtenant if, from the surrounding circumstances and other relevant provisions in the deed, the parties intended it to run with the land. See *Stiefel* v. *Lindemann*, 33 Conn. App. 799, 806–807, 638 A.2d 642, cert. denied, 229 Conn. 914, 642 A.2d 1211 (1994); *Expressway Associates II* v. *Friendly Ice Cream Corp.*, 22 Conn. App. 124, 127, 576 A.2d 575 (1990), rev'd in part on other grounds, 218 Conn. 474, 590 A.2d 431 (1991); cf. *Blanchard* v. *Maxson*, 84 Conn. 429, 433, 80 A. 206 (1911) ("easement of way will never be presumed to be personal when it can fairly be construed to be appurtenant to land"). "The only certain method of avoiding controversy and making sure that an easement or a covenant in an instrument . . . will be construed as other than personal is to use appropriate language to make the intention clear. In the case of a natural person, such language might properly be 'heirs and assigns.' In the case of a corporation, it might properly be 'successors and assigns.' " *Brown* v. *Connecticut Light & Power Co.*, 145 Conn. 290, 299, 141 A.2d 634 (1958). "[W]here a restrictive covenant contains words of succession . . . a presumption is created that the parties intended the restrictive covenant to run with the land." *Weeks* v. *Kramer*, 45 Conn. App. 319, 323, 696 A.2d 361 (1997). Relevant factors include: "whether the language of the reservation indicates that the easement is intended to run with the land [and] . . . whether the easement is of value to the dominant estate itself . . . ." *Stiefel* v. *Lindemann*, supra, 807.

In this case, the two factors support the presumption that the covenant runs with the land. The language of the declaration unequivocally indicates that the restriction was intended to run with the land. It includes the words of succession several times as well as repeated statements that the covenants "run with the land."[5] In

---

[5] Here, the restrictive covenant provides that (1) the common grantor (Lornik) "desires to subject said property to certain restrictions and cove-

regard to the factor of value, the restriction enhances and will continue to enhance the value of the dominant estate, rather than merely conveniencing the grantor. See *Stiefel* v. *Lindemann*, supra, 33 Conn. App. 808; see generally 1 Am. Jur. 2d, Adjoining Landowners § 96 (1994) (as general rule, if covenant or agreement for view benefits land to which it relates and enhances value, easement created becomes appurtenant to land and passes with it). This is "strong evidence" and "must be given great weight in the ascertainment of the intent of the parties . . . ." *Kelly* v. *Ivler*, supra, 187 Conn.

nants between itself and the purchasers, their *heirs and assigns* . . . for the benefit of said purchasers, their *heirs and assigns*"; (2) Lornik "does declare that the property . . . is held and shall be conveyed subject to the restrictions and covenants hereafter set forth and which *shall run with the land* and be binding upon the said Lornik, Inc., its *successors and assigns*"; (3) "[a]ll plans and specification for [buildings] . . . to be erected on any lot shall be subject to the written approval of Lornik, Inc., or its *successors, assigns or nominee* duly authorized in writing, and before the commencement of work on said premises, a set of plans and specifications shall be filed for permanent keeping with the said Lornik, Inc., its *successors, assigns or nominee* designated as aforesaid, for its approval or disapproval"; (4) "[a]ny buildings erected and completed for a period of six . . . months from the date of obtaining the Certificate of Occupancy for which no prior approval was received or which approval or disapproval was never recorded, against which the said Lornik, Inc., or its *successors, assigns or nominees* or any owner of another lot subject to these covenants has or have brought no legal action during the said period . . . shall be conclusively presumed to have received the proper approval and consent . . . required aforesaid"; (5) "[a]ny dirt or soil removed from any of said lots shall be transported and delivered by the owner of said lot at his own expense to any other lot in said tract upon the request of and at no cost to Lornik, Inc., its *successors or assigns*"; (6) "[t]hese covenants are made for the benefit of Lornik, Inc. and any and all persons who may own or may hereafter acquire any of said lots. These covenants *are to run with the land* and shall be binding on all parties and persons claiming under them until September 1, 2006, after which time said covenants shall be automatically extended for successive periods of ten . . . years unless an instrument signed by a majority of the then owners of all lots subject to these covenants has been recorded agreeing to change said covenants in whole or in part"; (7) "[l]ocations of dwelling house, garage and any other buildings or additions to buildings to be erected on any lot shall be subject to written approval of Lornik, Inc., or its *successors or assigns* in order to preserve the view of other lot owners." (Emphasis added.)

42. If the easement is in its nature an appropriate and useful adjunct to the land conveyed, with nothing to show that the parties intended it to be a mere personal right, then it is an easement appurtenant. See *Dean* v. *Riley*, supra, 31 Conn. App. 90. There is nothing in the record to contradict the trial court's findings indicating that the restriction here was of significant value to the land now owned by the plaintiffs.

The defendants argue that established case law in Connecticut and elsewhere holds that any covenant requiring approval of design or location by a common grantor of a subdivided tract is personal in nature and may not, therefore, be enforced by one owner in the tract against another owner. They cite *Pulver* v. *Mascolo*, supra, 155 Conn. 644, and *Patrone* v. *Falcone*, 345 Mass. 659, 189 N.E.2d 228 (1963). The defendants' reliance on *Pulver* and *Patrone* is misplaced. In *Pulver* and *Patrone*, the courts respectively ruled that, in light of the surrounding circumstances and the language of the covenants, the parties did not intend for the restrictions to run with the land. The covenants at issue in those cases, however, unlike in the present case, did not expressly provide that the restrictions were to run with the land or that they were binding on the successors or assigns of the grantor *and* the heirs or assigns of the grantees.

In light of the intent expressed in the covenant, the nature of the restriction and the other surrounding circumstances, we conclude the trial court correctly determined that the restrictions were clearly and expressly intended to run with the land. Because any grantee under a general or uniform development scheme may enforce the restrictions against any other grantee; see *Contegni* v. *Payne*, supra, 18 Conn. App. 52; *Marion Road Assn.* v. *Harlow*, supra, 1 Conn. App. 333; the plaintiffs were entitled to enforce the restrictions against the defendants.

## II

The defendants claim that the trial court incorrectly construed the scope of the restriction. They argue that the restriction does not entitle the plaintiffs to the preservation of their view, as the trial court interpreted the term. They contend that the restriction was improperly expanded by the trial court's interpretation of the term "view" as "panoramic view." We disagree.

In reviewing this decision by the trial court, we are confronted with a review of not just the language of the declaration, but also the trial court's factual findings underlying its conclusions. "[W]hen the underlying facts that form the basis of the trial court's legal conclusion as to intent are challenged, our review is limited to determining whether the findings as to those underlying facts are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those findings are clearly erroneous." *Dean* v. *Riley,* supra, 31 Conn. App. 92.

In reaching its factual findings, the trial court received and weighed evidence emanating from two sources, the first being Tabacco, the creator of the covenant.[6] It is proper for the trial court to determine the creator's intent by examining all of the surrounding circumstances. See id., 93; see also *Lake Garda Improvement Assn.* v. *Battistoni,* 160 Conn. 503, 513, 280 A.2d 877 (1971). The trial court evaluated the testimony of the creator, which necessarily gave rise to an assessment of credibility. See *Dean* v. *Riley,* supra, 31 Conn. App. 93; see also *American Trading Real Estate Properties, Inc.* v. *Trumbull,* 215 Conn. 68, 75, 574 A.2d 796 (1990).

---

[6] Tabacco testified as to his understanding of the intent behind, and the meaning of, the words "preserve the view" in paragraph twenty; he also testified regarding the circumstances surrounding his approval of the defendants' plans.

A second source of evidence before the trial court relating to the meaning of the language of paragraph twenty was its own on-site viewing of the properties and the entire area. "A view of the subject matter in dispute may be taken by the court, in the exercise of a sound discretion, whenever it is necessary or important to a clearer understanding of the issues." (Internal quotation marks omitted.) *Conservation Commission* v. *Price*, 193 Conn. 414, 425, 479 A.2d 187 (1984). "Information obtained through a visual observation of the locus in quo is just as much evidence as any other evidence in the case." *Kuras* v. *Kope*, 205 Conn. 332, 345 n.7, 553 A.2d 1202 (1987); see *Anderson* v. *Latimer Point Management Corp.*, 208 Conn. 256, 262, 545 A.2d 525 (1988); *Birnbaum* v. *Ives*, 163 Conn. 12, 20, 301 A.2d 262 (1972); *Kelman* v. *McDonald*, 24 Conn. App. 398, 401–402, 588 A.2d 667 (1991). "Evidence obtained by visual inspection is not subject to appellate review. *Lupinacci* v. *Planning & Zoning Commission*, 153 Conn. 694, 700, 220 A.2d 274 (1966)." *Kelman* v. *McDonald*, supra, 402. Conclusions based on such evidence are "entitled to great weight on appeal"; *Saphir* v. *Neustadt*, 177 Conn. 191, 199, 413 A.2d 843 (1979); and are subject to review only for clear error. See *Kuras* v. *Kope*, supra, 345 n.7.

In so far as it received testimonial and site observation evidence, the trial court's role was that of a fact finder. "In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." (Internal quotation marks omitted.) *Kelman* v. *McDonald*, supra, 24 Conn. App. 401. We "defer to the court's determination as to the credibility of witnesses and its finding of the facts underlying that conclusion." *Dean* v. *Riley*, supra, 31 Conn. App. 93. "We cannot disturb the trial court's finding if it is legally supported by the evidence of the surrounding circumstances and the situation of

the property." *Mastronardi* v. *Infante*, 34 Conn. App. 584, 591, 642 A.2d 84, cert. denied, 231 Conn. 907, 648 A.2d 154 (1994); see also *Wheeler* v. *Foster*, 44 Conn. App. 331, 334, 689 A.2d 523 (1997).

In ascertaining the intended meaning of the term "view" as used in the covenant, the trial court made findings and reached its conclusions after properly accepting testimony and considering the evidence of the parties' intentions and the surrounding circumstances. See *Saphir* v. *Neustadt*, supra, 177 Conn. 199–200; see also *Ezikovich* v. *Linden*, 30 Conn. App. 1, 6, 618 A.2d 570, cert. denied, 225 Conn. 913, 623 A.2d 1023 (1993). It is clear from the trial court's decision that Tabacco's testimony was not given great weight. This is a decision that we cannot disturb on appeal absent a showing of clear error. See *Dean* v. *Riley*, supra, 31 Conn. App. 93. From its inspection of the properties and from the testimony it heard, the trial court could reasonably have made findings and, from those findings, reached its conclusions as to the intent expressed in the covenant. See generally *Saphir* v. *Neustadt*, supra, 199–200. The court's legal and factual conclusions are not clearly erroneous because they are supported by underlying factual findings set forth in its memorandum of decision, and the subordinate facts are amply supported by the evidence. See *Wheeler* v. *Foster*, supra, 44 Conn. App. 335; *Kelman* v. *McDonald*, supra, 24 Conn. App. 402.

The defendants contend that since the term "view" is not defined in the covenant, it cannot be expanded to include "panoramic view." Such an interpretation, they claim, contravenes the principle that terms of a restrictive covenant are to be construed narrowly and ambiguous terms are to be construed against the covenantee. The terms of a covenant, however, cannot be construed in a vacuum, but are to be understood in context. The word "view," outside of the entire context

in which it was used, has no precise legal significance. The meaning of the term varies with the purpose to be accomplished. See *Saphir* v. *Neustadt*, supra, 177 Conn. 203. Thus, the term "must be construed in light of the intention of the parties, which is to be determined from the language used, the circumstances, the motives of the parties and the purposes they sought to accomplish." Id.

The surrounding circumstances in this case include the physical situation of the properties, which the trial court had the opportunity to observe and which any person to whom the language is addressed reasonably would be expected to observe. The trial court determined, by reference to the covenant, and having observed the physical characteristics of the area, that the language in the covenant protecting the grantees' "view" referred to the sight lines over the roofs of the houses below.[7] To construe the word "view" otherwise would result in a restrictive definition that would thwart the intent of the parties. The interpretation proffered by the defendants is not wholly consistent with other provisions contained in the deed. It seems highly doubtful that the parties would have negotiated a provision for the protection of "some kind of view," as Tabacco testified, since virtually any construction on lot 9 would have resulted in the parties retaining "some" view. It is much more consistent with the other provisions in the covenant, and with the surrounding circumstances, that the parties included the provision to protect the panoramic views to which the trial court referred in its decision. The evidence obtained by the trial court's

[7] The trial court could further conclude that a person exercising reasonable prudence, upon a reading of the covenant, and observing the land contours and the subdivision layout, would be informed that the protected view was as defined in its decision, that is, as the trial court said, "a view over the roofs of all the houses beneath the plaintiffs' houses or to the east of the plaintiffs' houses" while understanding that "a house built on lot nine would obstruct the lower view to some extent." Cf. *Mastonardi* v. *Infante*, supra, 34 Conn. App. 592.

observation of the locus in quo was informative on the issues of what intention the parties ascribed to the language of paragraph twenty and the circumstances surrounding the execution of the deed. The court properly considered this evidence in determining the meaning and scope of paragraph twenty.

## III

The defendants assert that the plaintiffs' action for injunctive relief is barred by the doctrine of laches. They refer to the two occasions when, prior to the commencement of this action, the Castonguays visited lot 9, and observed on the first visit the rough staking out of the future house, and on the second, in late March, 1996, the first few pages of the construction plans. The defendants emphasize that, after construction began in May, 1996, the plaintiffs still failed to object to the size and location of the structure until the roof frames were put in place.[8]

The defense of laches has application only when there is established unreasonable, inexcusable, and prejudicial delay in bringing suit. See *Cummings* v. *Tripp*, 204 Conn. 67, 88, 527 A.2d 230 (1987). The defense is comprised of two elements: (1) a delay that was inexcusable; and (2) a delay that prejudiced the defendant. See *Berin* v. *Olson*, 183 Conn. 337, 344, 439 A.2d 357 (1981); *Danaher* v. *C.N. Flagg & Co.*, 181 Conn. 101, 107, 434 A.2d 944 (1980); *Kurzatkowski* v. *Kurzatkowski*, 142 Conn. 680, 685, 116 A.2d 906 (1955). The burden is on the party alleging laches to establish the defense. See *Cummings* v. *Tripp*, supra, 88. Whether a plaintiff has been guilty of laches is an issue of fact for the trier, which cannot be made by an appellate court unless the subordinate facts found make such a conclusion inevitable as a matter of law. See *Farmers & Mechanics Savings Bank* v. *Sullivan*, 216 Conn. 341,

---

[8] As stated, this action was brought on June 12, 1996.

350, 579 A.2d 1054 (1990); *Kurzatkowski* v. *Kurzatkowski*, supra, 684.

The trial court found that this action was commenced as soon as it became apparent to the plaintiffs that the house being constructed on lot 9 was going to obstruct almost completely their panoramic view. Regarding the Castonguays' earlier visits to lot 9, the court commented that the plaintiffs were not contractors or builders, and were not experienced in the layout of property; further, that the meetings were "quite casual with no studying of the plans [and] no finalized layout of the house." The court also observed that the Howards never met with the defendants, and found that all plaintiffs had "every reason to rely upon the assurances of Mr. Tabacco that their view would be protected and to rely upon section 20 of the restrictions and covenants." In rejecting the laches defense, the trial court specifically found that the plaintiffs had "notified the defendants as soon as it became evident to them that their rights were not being protected [and] that their view was going to be spoiled by the massive roof of the new house directly in their panoramic view."[9] We see no reason to disturb these findings.

## IV

The defendants claim that the injury to them resulting from the injunction is greatly disproportionate to the injury of which the plaintiffs complain. The granting of an injunction rests within the sound discretion of the trial court and "[i]n exercising its discretion, the court . . . may consider and balance the injury complained of with that which will result from interference by

---

[9] The trial court stated that a quick view of the construction plans for the lot 9 house "might easily cause one to describe it as a story and a half," and, "it would take an experienced builder to determine the future effect on the plaintiffs' view." The court also found that the plaintiffs, "relying on clause 20 and the assurances of Tabacco, would have no reason to be alarmed until the framing for the large expanse of roof had begun."

injunction." *Moore* v. *Serafin*, 163 Conn. 1, 6, 301 A.2d 238 (1972); see also *Berin* v. *Olson*, supra, 183 Conn. 343. "The relief granted must be compatible with the equities of the case." *Walton* v. *New Hartford*, 223 Conn. 155, 167, 612 A.2d 1153 (1992); see *Moore* v. *Serafin*, supra, 5; *Crabtree* v. *Coyle*, 19 Conn. App. 208, 211, 561 A.2d 455 (1989). The action of the trial court will not be disturbed unless it constitutes an abuse of discretion. See *Anderson* v. *Latimer Point Management Corp.*, supra, 208 Conn. 262; *Crabtree* v. *Coyle*, supra, 211.

In its memorandum of decision, the trial court expressly weighed the competing equities and concluded that, although some hardship would result to the individual defendants as a consequence of this injunction, it would not be greatly disproportionate to the plaintiffs' injury. The court was informed of the expenses incurred by the defendants in the purchase of lot 9 and in the partial construction of the house. In assessing the relative hardships, the court found that the continued construction of the defendants' home, as planned, would forever destroy the panoramic view for which the plaintiffs also had expended substantial sums of money. Regarding the adequacy of a remedy at law, the court stated that considering "the prime importance of the panoramic view, the loss of same would be permanent, irreplaceable, and a loss for which there could be no suitable compensation." Additionally, the trial court determined that the defendants had the opportunity to conform with the declaration's requirements and did not, although the contour of the land was such that they could have conformed with them. Regarding the construction completed to date on lot 9, and the relative equities pertaining thereto, the court found specifically that the plans and existing partial construction could still be altered to alleviate the defendants' hardship, and that any additional costs incident thereto should more properly be absorbed by the defendants.

"When presented with a violation of a restrictive covenant, the court is obligated to enforce the covenant unless . . . the defendant can show that enforcement would be inequitable." *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 139, 475 A.2d 305 (1984), citing *Hartford Electric Light Co.* v. *Levitz*, 173 Conn. 15, 21, 376 A.2d 381 (1977). We recognize that " '[a] strict legal right, if incompatible with the equities of the case, does not necessarily entitle one to equitable redress.' " *Gerald Park Improvement Assn.* v. *Bini*, 138 Conn. 232, 236, 83 A.2d 195 (1951). In this case, however, it is apparent that the trial court carefully considered, weighed and balanced the opposing equities in granting the injunction. Our review is limited to whether the court abused its discretion. The court's memorandum clearly indicates that it undertook a thorough process of weighing all the equities, and we cannot conclude that its granting of the equitable relief requested amounted to an abuse of discretion.

## V

The defendants maintain that the terms of the injunction are not sufficiently clear and definite to enable them to comply with the trial court's order. "A judgment must so dispose of the matters in issue that the parties and other persons affected will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined." *Contegni* v. *Payne*, supra, 18 Conn. App. 59. The terms of an injunction should have sufficient clarity and specificity to allow the parties to ascertain with reasonable certainty what is prohibited or required. See *Dingwell* v. *Litchfield*, 4 Conn. App. 621, 625, 496 A.2d 213 (1985). "Where a judgment lacks such certainty and is unintelligible, it is a nullity." *Contegni* v. *Payne*, supra, 59.

A careful reading of the trial court's memorandum of decision reveals that the terms of the injunction are

sufficiently clear in defining the rights and obligations of these parties. The court enjoined the defendants from continuing to build the house now under construction; further, the defendants are not to build any house on lot 9 that would unduly restrict the plaintiffs' panoramic view. The use of the term "panoramic view" is fully explained in the trial court's decision. The mandate of this injunction, in the context of the memorandum of decision, is not unclear or of uncertain meaning. The court stated that "even now" the plans and construction might be altered, and, as the plaintiffs point out, the prohibition is essentially that no house be constructed on lot 9 unless it is so designed and located so that it would not rise above the overall levels of the roofs of houses on Old Cider Mill Road. We cannot conclude, reading the trial court's full decision, that the judgment fails to satisfy the requirements of reasonable certainty and specificity.

The judgment is affirmed.

In this opinion the other judges concurred.