[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Gloria Coles, sues the defendant, J K Assoc., L.L.C., for breach of contract, misrepresentation, unjust enrichment, and reformation pertaining to the conveyance of a tract of land located in Ellington, Connecticut. The defendant denies the allegations, raises the special defense of laches, and counterclaims based on breach of contract.
On December 12, 13, and 14, 2000, the court heard the trial of these matters. During trial, the plaintiff withdrew any claim for monetary damages and now seeks only reformation of a deed. The court finds the following facts.
On January 26, 1995, the plaintiff and her former husband, Dr. C. M. Cohen, ended their marriage by way of a dissolution judgment which distributed the tract of land which is the subject of this litigation to the plaintiff. The plaintiffs residence is located on this land.
Three years before the dissolution, Dr. Cohen had Gardner and Peterson Associates prepare a conceptual plan for subdividing the tract. That firm drafted a conception layout to subdivide the property which was revised CT Page 4305 on October 1, 1992, and is Exhibit 28. This layout is not an A-2 survey, but is a schematic drawing showing how the property might efficiently be subdivided. The tract abuts the westerly edge of Egypt Road in Ellington, a highway which runs generally north and south. The proposed layout divides the parcel into thirty-two lots with proposed roads. No courses and distances are delineated on the plan. The plan recites that the total area of the tract is "39.0 Ac ±." Each lot is ascribed particular acreage and frontage. The plaintiffs residence is depicted as Lot 2. Lot 2 is described on Exhibit 28 as having 2.41 acres and 360 feet of frontage. Lot 1 is described as having 1.15 acres and 160 feet of frontage.
In early 1998, the plaintiff decided to market the tract for residential development. In February 1998, Tom Savage, principal owner and manager of the defendant corporation, expressed an interest in purchasing the property. He and the plaintiff walked the site. Savage, on behalf of the defendant, and the plaintiff signed a letter of intent, drafted by the defendant's attorney, Atherton Ryan, for the purchase and sale of the real estate. Paragraph 12 of the letter describes the property to be conveyed by the plaintiff as comprising approximately thirty-six acres and as excluding the plaintiffs residential lot. The typewritten letter contains a handwritten notation, authorized by the plaintiff, indicating that the excluded land contained about 3.56 acres and was Lots 1 and 2 of the conceptual layout, Exhibit 28.
Being untutored in the field of real estate development, the plaintiff retained a "consultant," Matthew Allen. Allen's role was to advise the plaintiff during the negotiations that were to ensue and assist her until the transfer was completed. Allen was familiar with real estate development in Ellington, but he is not an attorney.
Based on preliminary discussions, an agreement to convey the land was reached and incorporated into a written contract, Exhibit 3. This purchase and sale agreement called for the defendant to pay to the plaintiff $15,000 for each approved subdivision lot or $435,000, whichever was the greater sum. The defendant was to provide $100,000 at the closing, and the plaintiff agreed to afford the defendant a purchase money mortgage for the balance of $335,000. This mortgage debt was to bear no interest for two years and yield six percent annual interest thereafter. The mortgage note was payable in full after four years. The closing was required to occur within seven days, after the expiration of any appeal period, from the final approval by all regulatory agencies.
Under the contract, the land to be conveyed to the defendant was the tract depicted in the Gardner and Peterson layout, Exhibit 28, minus Lots 1 and 2 on that layout, which layout the contract refers to as "Exhibit CT Page 4306 `A'." The agreement neither mentions the acreage of the land to be transferred to the defendant nor that of the land retained by the plaintiff.
The contract further requires the plaintiff to provide the town of Ellington and any utility company with those easements necessary to obtain approval of the subdivision, building permits, and certificates of occupancy. Also, the plaintiff agreed to subordinate her purchase money mortgage lien to construction loan mortgages for the houses to be erected on the lots "in an amount not to exceed $864,000.00." The total amount of the purchase money mortgage and construction loans could not surpass eight percent of the value of the land and any improvements constructed.
In the conceptual plan, Exhibit 28, Lot 1 abuts Egypt Road and has as its northeasterly corner the southwesterly intersection of Egypt Road and a proposed access road to the interior of the tract from Egypt Road. The proposed access road runs in a northwesterly curve from Egypt Road to a point where the access road would fork into two proposed roads forming, altogether, a Y-shaped figure. The conjunction of the proposed roads forms the northerly boundary of Lot 2 which lies generally to the south of the Y-shaped intersection. Consequently, the combination of Lots 1 and 2 results in a roughly five-sided piece of land with its easterly boundary being Egypt Road; its northeasterly and northwesterly boundaries being the southerly line of the Y-shaped intersection, its westerly boundary being Lot 3, and its southerly boundary being land unrelated to this subdivision.
At the time the contract was made, the defendant had obtained no completed survey of the tract the company was purchasing. The defendant hired the civil engineering firm of Messier and Associates to conduct the survey and prepare the plans necessary to obtain subdivision approval and the other permits needed to develop the property. That firm drew up maps and plans which mirror the conceptual layout of Exhibit 28, however, fewer lots that the thirty-two originally proposed proved feasible after various test results were obtained. The defendant named the subdivision "Pioneer Heights."
On September 28, 1998, the Ellington Planning and Zoning Commission conditionally approved the Pioneer Heights subdivision as depicted in the survey and plans submitted by the defendant, which documents are Exhibit 30. The plans and diagrams of Exhibit 30 display a design layout of proposed roads substantially the same as that depicted in Exhibit 28, Dr. Cohen's conceptual layout. Exhibit 30 contains precise survey information, including the courses and distances for the boundaries of each lot. CT Page 4307
The subdivision approval was conditioned on the defendant satisfactorily addressing certain concerns of the Ellington town engineer, James A. Thompson. He found the proposed road system of the subdivision unacceptable because grade maxima would be exceeded once houses and driveways were constructed. Thompson suggested a solution by reconfiguring the access road from Egypt Road and the branches off that access road. The redesign he proposed involved altering the access road direction from Egypt Road to run more nearly westerly than northwesterly and to form a T-shape intersection rather than the Y-shape intersection as contained in Exhibits 28 and 30.
The defendant, through Savage and without consulting or notifying the plaintiff, her attorney, or Allen, had Messier and Associates redesign the proposed road layout adopting Thompson's recommendations. The redesigned plan is Exhibit 29. This reconfiguration modified the shape of Lots 1 and 2 so that the combination of these lots now formed a quadrangle rather than a pentagon. This result was accomplished by lopping off from the northerly apex of Lot 2 about .19 acres and adding about .02 acres to the northeasterly corner of the intersection of Egypt Road and the proposed access road. The resulting acreage for Lots 1 and 2 as reconfigured is 2.9 acres. A comparison map of the original plan, Exhibit 30, and the redesigned plan, Exhibit 29, is depicted in Exhibit 32.
At the time of the reconfiguration, Savage knew that the plaintiff wanted to retain more than three acres of land for her residence because she wished to keep horses on the property and the Ellington zoning regulations had a three acre minimum acreage requirement for that use. Savage also knew at that time that the plaintiff intended to build a horse barn near the northeasterly corner of the property she was retaining as her residence.
No closing date had been set within the seven day period after successful completion of the regulatory procedures as called for in the contract. The plaintiff pressed the defendant to schedule a closing date, but the defendant delayed because the final subdivision plans upon which approval depended were still being drafted by Messier and Associates. In order to avoid breaching the contract, the parties agreed to a closing date of November 25, 1998.
At the closing on that date Attorney Arthur Meisler represented the plaintiff, and Attorney Ryan represented the defendant. Two days earlier, the redesigned, final subdivision plan was finished. Savage retrieved that map, Exhibit A, from Messier and Associates and transported it forthwith to Attorney Ryan's office. Attorney Ryan drafted a deed description of the property to be conveyed by the plaintiff utilizing that plan. A copy of that deed description was relayed to Attorney CT Page 4308 Meisler's office so that his office could prepare the warranty deed. Attorneys Ryan and Meisler and the plaintiff were all unaware that Exhibit A had reconfigured the proposed road layout and substantially modified the shape and acreage of Lots 1 and 2 which were to be excluded from the conveyance to the defendant.
On November 25, 1998, the closing began. The plaintiff, Attorney Meisler, Allen, Attorney Ryan, and Savage were present. The reconfigured survey map, Exhibit A, was lying on a table between those attending the closing. At the closing, only Savage knew that this survey and the deed description drawn from it had altered the size and shape of Lots 1 and 2 from the depiction of those lots in the Gardner and Peterson conceptual plan, Exhibits 28, and the subdivision plan which had been submitted to and conditionally approved by the Ellington Planning and Zoning Commission, Exhibit 30. The plaintiff and Attorneys Meisler and Ryan all believed that the deed description accurately portrayed the property to be sold and properly carved out Lots 1 and 2 as shown in the Gardner and Peterson plan, Exhibit 28.
During the closing and in the presence of Savage, the plaintiff specifically inquired of Attorney Meisler if she was retaining Lots 1 and 2, and he affirmed that she was. Savage, despite knowing that the final subdivision plan and the deed description derived therefrom of Lots 1 and 2 had changed, remained mute. As a result, the deed conveyed to the defendant more land and different land than that agreed to be conveyed under the purchase and sale agreement, Exhibit 3.
The plaintiff executed the transfer mistakenly believing that she was conveying to the defendant the property depicted in the Gardner and Peterson plan, Exhibit 28, minus Lots 1 and 2 as shown on that plan. Instead, the deed conveyed to the defendant more and different land because of the change in the proposed road layouts. Savage had substituted the final subdivision plan, Exhibit 29, for the original plan, Exhibit 30, and failed to inform the plaintiff, Allen, Attorney Meisler, or Attorney Ryan of the substitution.
About one month after the closing, tree removal and road boxing began in order to develop the Pioneer Heights subdivision. This activity alerted the plaintiff to the discrepancy between Lots 1 and 2 in the original plan, Exhibit 30, and the substituted one, Exhibit 29. This discovery led to inquiries by which the plaintiff also learned from Savage that she only retained 2.9 acres. Despite her immediate objection and later negotiations between the parties, no resolution was attained.
On August 15, 1999, the plaintiff commenced this action. Additional facts will be recited where necessary. CT Page 4309
 I
As to the first count of the complaint, alleging a breach of contract, the court finds for the defendant. The defendant fulfilled all of its obligations under the purchase and sale agreement, i.e. it paid the plaintiff the agreed purchase price. The fact that it received more and different land than that called for in the contract is no breach by the defendant. It was the plaintiff who, under the contract, had the obligation to convey land to the defendant. Therefore, the plaintiff has failed to prove, by a preponderance of the evidence, that the defendant breached the contract by its actions or inactions.
 II
The second count of the complaint alleges misrepresentation. Again, the court finds that the plaintiff has failed to prove this allegation by clear and convincing evidence. The plaintiff specifically avers that the defendant, through Savage and/or Attorney Ryan, on November 25, 1998, at the closing represented that the deed accurately described that portion of the tract which was to be conveyed and that which was to be retained under the purchase and sale agreement. Neither Savage nor Attorney Ryan made any such representation at the closing on November 28, 1998.
Having failed to meet her burden of proof regarding misrepresentation, the court finds for the defendant on the second count.
 III
As noted above, the plaintiff withdrew any claim for relief in the form of monetary damages. The sole remedy presently sought by the plaintiff is reformation of the deed based on allegations contained in the fourth count of the complaint. The standard of proof for an action seeking reformation of a deed is proof by clear and convincing evidence,Patrochio v. Yalanis, 4 Conn. App. 33, 35 (1985). Reformation is available in cases of unilateral mistake coupled with inequitable conduct on the part of the other party to a contract or deed, Lopinto v. Haines,185 Conn. 527, 531 (1981); Patalano v. Chabot, 139 Conn. 356, 359
(1952).
The court finds that the plaintiff has proven by clear and convincing evidence, that she mistakenly executed the deed conveying to the defendant different property that was agreed upon under the contract and that she believed she was conveying. The plaintiff, her attorney, and Attorney Ryan were unaware that Savage had given to Attorney Ryan to prepare the deed description a land survey which reflected a CT Page 4310 reconfiguration of Lots 1 and 2.
The fact that the plaintiff and her counsel had available to them at the closing a map, Exhibit A, which depicted the modified proposed road layout and that they failed to verify that Lots 1 and 2 remained unaltered from the original plan is of little importance, Cherkoss v.Gasser, 123 Conn. 368, 371 (1977). "Our rule is that negligence may not of itself be a sufficient ground for refusing [reformation of a deed] if it appears that the other party has not been prejudiced thereby," Id. In this case, the defendant cannot claim to be prejudiced by the plaintiffs failure to confirm that the final subdivision plan, which he substituted without their knowledge, was identical with the plan submitted to the planning commission for approval and the plan referred to in the purchase and sale agreement. Savage was present at the closing and in a position to observe whether the plaintiff or her counsel ever perused the substituted plan or not.
The court also finds, by clear and convincing evidence, that the defendant's agent, Savage engaged in inequitable conduct on behalf of the corporation. Inequitable conduct can occur even in the absence of actual or constructive fraud, Lopinto v. Haines, supra, 534 and 535. Mere knowledge of another's ignorance or mistake, used to advantage, can constitute inequitable conduct, Id. In the present case, Savage never informed his own attorney, the plaintiff, nor her attorney that he was altering and reducing the size and shape of Lots 1 and 2 from the depiction of these Lots in the Gardner and Peterson plan and the plan conditionally approved by the planning commission, Exhibits 28 and 30. Savage was certainly aware that the plaintiff desired to retain the land contained in Lots 1 and 2 as shown on those plans in order to own a residential lot of greater than three acres so that she could raise horses on the property and construct a horse barn. When the plaintiff at the closing expressly asked about what land she was retaining, Savage sat silent despite the apparent ignorance of the plaintiff and her counsel regarding the changes to Lots 1 and 2.
Savage's silence worked to the advantage of the defendant. Had the plaintiff known of the diminution of acreage of Lots 1 and 2, she would have terminated the transaction, and Savage was aware of this consequence. The defendant was in a bind because it needed to adjust the sizes and shapes of Lots 1 and 2 to accommodate the changes in road construction suggested by the town engineer. By unilaterally substituting the design of Exhibit 29 for that of Exhibit 30, the defendant was able to close the sale and satisfy the town engineer without additional negotiations or costs, a significant advantage.
Reformation of a deed is an equitable remedy, Derby Savings Bank v.CT Page 4311Oliwa, 49 Conn. App. 602, 603 (1998). In the present case, the deed executed by the plaintiff failed to reflect her intent because the defendant's agent unilaterally substituted a modified map for the one which the plaintiff and her counsel believed was the source of the deed description. Unless reformed, the plaintiffs residential lot will contain less land than she contemplated, depriving her of side yard distance and the opportunity to maintain horses on the property under local zoning regulations.
Savage knew of her intentions when he substituted the modified plan which reduced the plaintiffs retained lot sizes and altered the resulting shape of her property. Once this substitution was revealed to the plaintiff and despite his knowledge of her objection to this discrepancy, he elected to proceed with the construction of roads and sale of lots utilizing, the substituted subdivision plan. Seven houses have been built and sold to third parties since November 1998. Three more are presently under construction. The purchasers of the lots in the Pioneer Heights development know of this dispute. Again, the road installations costs were incurred after the defendant knew of plaintiffs epiphany regarding the changes to Lots 1 and 2.
Balancing equitable considerations, the court determines that the deed must be reformed to conform to the perimeter and average of Lots 1 and 2 as depicted in Exhibit 30. In Section III of its post trial brief, the defendant argues that, if the court decides that the plaintiff is entitled to reformation of the deed, the court ought to award to the plaintiff .1631 acres of land lying along a back boundary of the plaintiffs property so that the access road which has been constructed need not be moved. The defendant contends that reforming the deed to convey back to the plaintiff a portion of the land under the present road would create a disproportionate and inequitable burden on the defendant to build a new access road for the subdivision.
This argument has some appeal, but case law dictates that a court may only reform a deed to reflect the original intent of the parties. "The court cannot supply an agreement which was never made, for it is its province to enforce contracts, not to make or alter them. It must appear that the mistake consisted in not drawing up the instrument according to the agreement that was made." Hoffman v. Fidelity and Casualty Co.,125 Conn. 440, 443 (1939).
Reformation is unavailable to make a new agreement or to supply terms outside the original intent of the parties, Brown v. Equitable LifeAssurance Society of the United States, 766 F. Sup. 928, 932 (D.Kan. 1991). "It is well established that reformation is appropriate only to conform an agreement to accurately reflect the intentions of the parties CT Page 4312 at the time of the agreement. . . . It is not what the parties would have intended if they had known better, but what they did intend at the time, informed as they were," Beecher v. Able, 575 F.2d 1010, 1015 (CA 2 1978). "A court does not have carte blanch to reform any transaction to include terms that it believes are fair. Its discretion is narrowly bounded." Cunningham v. Cunningham, 690 P.2d 549, 552 (Utah 1984. In accord see, Mutual of Omaha Insurance Co. v. Russell, 402 F.2d 339, 344
(CA 10 1968); McCay v. Jenkins, 15 So.2d 409, 411 (1943).
Consequently, the court can only order that the deed be reformed to reflect the retention of Lots 1 and 2 as originally depicted in Exhibit 30 which was the intention of the plaintiff when she executed the deed.
 IV
The defendant raises the equitable special defense of laches. Laches applies only when a defendant establishes that the plaintiff engaged in unreasonable, inexcusable, and prejudicial delay in bringing suit,Castonguay v. Plourde, 46 Conn. App. 251, 265 (1997). It arises from a failure of attention to one's own interests, Allis v. Hall, 76 Conn. 322,334 (1902).
In the case at hand, the defendant has failed to prove that the plaintiff unreasonably or inexcusably delayed starting this action. As soon as the plaintiff discovered the discrepancy, about one month after the deed was executed, she contacted her attorney. Counsel for both parties attempted to negotiate a resolution without success. The plaintiff commenced litigation within nine months of her recognition of the mistake. Before December 1998, the plaintiff relied in good faith on the premise that the deed description, drafted by the defendant's attorney, correctly excepted from the tract sold to the defendant Lots 1 and 2 as depicted on the Gardner and Peterson plan.
By inaction, Savage allowed the plaintiff to persist in this delusion. The defendant's claim of laches must be viewed in light of the defendant's contribution to the plaintiffs misunderstanding, Allis v.Hall, supra, 336. The application of the doctrine of laches "assumes a different aspect when the party who appeals to its protection is one who not only knows the adverse claim and the assertion of it, but the very facts which establish the claim to be a valid one," Id.
The court finds for the plaintiff on the fourth count of the complaint and orders reformation of the deed as noted above.
 V
CT Page 4313
Turning to the counterclaim, the defendant alleges that the plaintiff breached the purchase and sale agreement by refusing to subordinate her purchase money mortgage to construction loans and refusing to grant utility easements upon request. The court finds that the defendant has failed to meet its burden of proving these allegations by a preponderance of the evidence.
Paragraph 4(a) of the contract, Exhibit 3, obligates the plaintiff to subordinate her mortgage to construction loans in an amount not to exceed $864,000. The amount of construction loan mortgage debt to which she was requested to subordinate, however, was the sum of the principals of three construction loans, all executed on June 11, 1999, Exhibits 36, 37 and 38, totaling $2,328,000 ($721,000 plus $807,500 plus $800,000). Therefore, under the contract the plaintiff has no obligation to subordinate because this sum exceeds $864,000, and her refusal to subordinate was no breach of the agreement.
Paragraph 6(c) of the contract requires the plaintiff to convey utility easements necessary to obtain subdivision approval, building permits, and certificates of occupancy if requested by a utility company. No utility company ever made such request of the plaintiff. Instead, thedefendant tendered a request to subordinate the plaintiffs mortgage to easements to be conveyed by the defendant to the utility companies. No provision of the agreement obligated the plaintiff to subordinate her mortgage to easements. Again, no breach of the contract occurred.
In summary, the court finds for the plaintiff on the reformation of deed count and for the plaintiff on the defendant's counterclaim.
Sferrazza, J.