UNIFIED SCHOOL DISTRICT NO. 1 *v.* CONNECTICUT
DEPARTMENT OF EDUCATION ET AL.
(AC 19311)

Schaller, Zarella and Peters, Js.

[6] See footnote 5.
[7] See Practice Book § 11-12.

Argued December 5, 2000—officially released July 17, 2001

*Ann E. Lynch,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellant (plaintiff).

*Gwendolyn K. McDonald,* for the appellee (defendant A).

*Opinion*

SCHALLER, J. The plaintiff, Unified School District No. 1,[1] appeals from the judgment of the trial court upholding the decision of a hearing officer of the defendant department of education to grant to the defendant A[2] one year of compensatory education. On appeal, the plaintiff claims that the court improperly (1) upheld the award to A because the award was barred by laches, (2) awarded compensatory education from March 21, 1997, through August 27, 1997, (3) failed to consider the fact that A conceded that he did not regress between March 21, 1997, and August 27, 1997, and, thus, was not entitled to compensatory education during this period, (4) found that the program offered to A between March 21, 1997, and August 27, 1997, was inappropriate, (5) awarded compensatory education for the periods of February 20, 1996, to May 2, 1996, and from June 5, 1996, to September 9, 1996, (6) upheld the award for compensatory education notwithstanding the finding that A was incompetent and (7) upheld the order that the plaintiff hold a pupil placement team meeting for A within forty-five days of issuance of the order in light of the uncertainty surrounding the release of A from Connecticut Valley Hospital. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. A is a twenty-one year old man who, in 1990, at the age of eleven, moved to Connecticut from Puerto Rico. On October 23, 1991, a public school psychologist evaluated A and found him to have an IQ of sixty-one, placing him in the mildly mentally retarded range. Other testing administered at that time also suggested that A had very low cognitive functioning. On

---

[1] Unified School District No. 1 is a special school district within the department of correction established pursuant to General Statutes § 18-99a.

[2] The name of the defendant is not disclosed pursuant to General Statutes § 10-76h (d) (1).

January 21, 1993, A was classified as learning disabled. The public middle school developed an individualized education program for A. During the 1993-1994 school year, A was reclassified as being educable mentally retarded and was placed in a highly structured, self-contained, bilingual special education program at a public high school.

In April, 1995, A was arrested. On July 18, 1995, A was admitted to Riverview Hospital (Riverview)[3] for a determination of competency. Upon admission to Riverview in 1995, A underwent psychological, psychosocial and psychiatric assessments.

Within one month after A's admission to Riverview, a pupil placement team meeting was convened to review his previous and current assessments, to determine A's eligibility for special education and related services, and to develop an individualized education program for him. The hearing officer found that the pupil placement team at Riverview had determined that A was eligible to receive special education services because of his social and emotional maladjustment, that "further assessment regarding his speech and language impairment was required in order to develop appropriate goals and objectives, that 'consultation' with an [English as a second language] teacher would be provided, and that neither an extended school year nor other residential placement was required in order for A to benefit from his education."

On the basis of the 1995 individualized education program developed by Riverview, A was placed in an ungraded self-contained classroom in a residential facility at Riverview and provided with language therapy and

---

[3] Riverview is associated with Unified School District No. 2, a special school district within the department of children and families established pursuant to General Statutes § 17a-37.

individual counseling. On October 17, 1995, Riverview discharged A, finding him competent to stand trial.

On November 13, 1995, the public high school in the town in which A's mother lived held a pupil placement team meeting and identified A as a special education, multihandicapped student. On February 20, 1996, A was arrested for burglary and larceny, and was incarcerated at the Hartford Correctional Center (center), at which time a department of correction social worker at the South Block Mental Health Unit observed and assessed him. The department psychiatric social worker interviewed A on February 20, 1996, at which time A indicated that he was not interested in a referral for educational services. On March 21, 1996, A completed a form, however, indicating that he was interested in special education and that he did not have a history of special education, and authorizing the release of his records to the center.

Personnel at the center did not attempt to obtain A's records at that time. The hearing officer found that "[a]ccording to 'District Student Find Procedures' . . . all inmates who choose to attend school are to be screened for potential handicapping conditions within two weeks of their assignment to school. Such screening is to include 'the administration of standardized group intelligence and achievement tests and an interview by the school psychologist or special education teacher.' " A was placed in an English as a second language class at the center on March 21, 1996.

On March 25, 1996, the center placed A in the restricted housing unit administrative detention for his having committed arson and, subsequently, in punitive segregation until May 3, 1996. An inmate placed in restrictive housing or punitive segregation is not permitted to attend classes.

On May 3, 1996, A was released from the custody of the department, he was arrested on June 5, 1996, on new charges and again incarcerated at the center. In June, 1996, the center social worker referred A to the state of Connecticut office of protection and advocacy for persons with disabilities (office of protection and advocacy) in the belief that the office could assist A in obtaining postincarceration services from the state of Connecticut department of children and families. On July 8, 1996, A again was enrolled in an English as a second language class. On July 9, 1996, A was released from the custody of the center. A returned to the center on July 10, 1996, for unknown reasons.

From July, 1996, until September 8, 1996, A was seen on an outpatient basis at the center. In August, 1996, A was placed in punitive segregation as a result of several disciplinary reports. On September 9, 1996, A was released to Riverview for a court-ordered competency determination and remained at Riverview until October 31, 1996. On September 9, 1996, a child study team meeting was held at Riverview to evaluate A as an incoming student. Riverview staff certified the previous public school district's determination of A's special education eligibility on November 13, 1995, and implemented the previous school's individualized education program.

A pupil placement team meeting at Riverview was scheduled for October 4, 1996. According to the hearing officer, at that meeting the team determined that (1) "no further assessment of A was warranted at that time," (2) "A was eligible to receive special education services based on the exceptionality of serious emotional disturbance," (3) "[A] should participate in the regular behavior management program at Riverview," (4) "A should receive, as related services, individual counseling and speech and language therapy to address A's emotional issues and language difficulties" and (5) "the goals and

objectives developed at the 8-17-95 [pupil placement team meeting] were appropriate for current implementation . . . ."

On November 1, 1996, A was released from Riverview and returned to department custody at the center. Upon his return to the center, A signed a consent form for admission to the mental health unit. The hearing officer found that "according to 'District Student Find Procedures' . . . 'the schools at each institution/center within [Unified School District No. 1] continually survey all places within each institution/center in which disabled students may be found.' " The Unified principal and the special education teacher at the center did not survey the mental health unit.

A was evaluated in November, 1996, by Nelson Rivera, a psychologist, who had been asked to review all previous psychological and educational testing of A. Rivera interviewed and tested A, finding A's thought processes to be normal, A's attention and concentration skills to be slightly below normal, A's intellectual ability low, his fund of information "below expectation," his abstract ability poor and his computational skills below average. Rivera found A's adaptive skills low and, along with A's mentally deficient functioning, suggestive of mental retardation requiring a supervised but not institutional setting. Rivera's prognosis for A was "guarded" given his behavioral problems, limited cognitive functioning, learning problems and lack of structure and family support. Rivera set forth the results of the evaluation in a written report dated December 3, 1996. The report was not brought to the attention of the plaintiff, nor was a pupil placement team meeting on behalf of A requested by the plaintiff at that time.

The department of children and families education consultant learned that A's involvement in his English as a second language course had declined to the point

to which he was transferred to self-study due to poor attendance and later dropped entirely from the program for failure to complete assignments. On March 21, 1997, the consultant informed the center school psychologist that A was a special education student and that Riverview had developed an individualized education program on October 4, 1996. On March 27, 1997, the center school psychologist, the special education teacher and the English as a second language teacher met and concluded that A's record from Riverview must be obtained to ascertain A's background and educational needs. On April 1, 1997, A submitted a form indicating his interest in attending school.

At some time prior to April 10, 1997, a representative of the office of protection and advocacy contacted Lillian Cruz, the executive director of Humanidad, Inc., a social service agency serving persons with developmental disabilities. Cruz and the office of protection and advocacy representative visited A at the center for approximately forty-five minutes. On April 10, 1997, Humanidad, Inc., submitted a proposal for services to the office of protection and advocacy. Cruz did not review any of A's educational records prior to submitting the proposal and had no specific program or plan to address A's particular situation.

On April 25, 1997, the center school psychologist, the special education teacher and the English as a second language instructor determined that beginning on May 2, 1997, the special education teacher would provide instruction to A in the segregated housing unit at the center to assess his educational needs. On April 29, 1997, the office of protection and advocacy received the proposed decision of the department of mental retardation denying A's eligibility for services from the department because A was capable of performing within the low average range of intelligence on psychological evaluations conducted in 1991, 1995 and 1996.

On May 9, 1997, the special education teacher, after three visits with A over a seven day period, concluded that A could read at a prefirst grade level, that his limited understanding of English impeded progress and that he could multiply and divide, making his math skills a relative strength. On May 22, 1997, following this assessment, a pupil placement team meeting was convened at the center to formulate an appropriate education program for A. A representative of the office of protection and advocacy stated that the office first became involved in A's case in July, 1996. The attorney for the office of protection and advocacy produced the reports of Rivera's psychological evaluations of A that had been performed at the center in November, 1996, and April, 1997. The meeting was adjourned until June 6, 1997, to allow the center time to review Rivera's reports.

When the meeting was reconvened, all parties characterized A as being educable mentally retarded. Attendees discussed A's self-inflicted wounds. Attendees further noted that the center placed A in a restrictive housing unit due to chronic disciplinary problems and for his own safety. The center's special education teacher presented an educational plan in which the special education teacher and the english as a second language teacher would work one on one with A in the restricted housing unit with a goal of transitioning A back to the general population so that he could attend regular classes. The attorney and representative for the office of protection and advocacy both questioned the goal of the proposed transition plan as not conforming to suitable educational objectives under the Individuals with Disabilities Education Act. 20 U.S.C. § 1400 et seq. (act). Following a statement by the plaintiff's principal to "cut to the chase," the attorney stated that the plan was unacceptable and that A was entitled to compensatory education. The meeting adjourned without resolution, and, on June 9, 1997, the office of protection and

advocacy requested a due process hearing on behalf of A.[4]

Between July 10, 1997, and September 26, 1997, the department of education held a series of hearings on this matter. On January 20, 1998, the hearing officer ordered the plaintiff to provide one year of compensatory education to A. On appeal, the trial court affirmed the decision of the hearing officer and dismissed the appeal. This appeal followed.[5]

We begin by articulating the standard of review for an appeal from the decision of an administrative agency. "Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its

[4] Neither of A's parents participated in this proceeding. On August 27, 1997, the center released A to Connecticut Valley Hospital for a determination of his competency to stand trial. On November 25, 1997, the hospital found A not competent to stand trial, and he remains a voluntary inpatient at the hospital.

[5] Even though A is now over the age of twenty-one, this appeal is not moot. A student who has been deprived of services to which he or she was entitled under the act has a right to compensatory education, regardless of whether he or she has passed the age of eligibility for current or future services under the act. See Pihl v. Massachusetts Dept. of Education, 9 F.3d 184, 188–89 (1st Cir. 1993).

enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection,* 253 Conn. 661, 668–69, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001).

General Statutes § 10-76h (d) (4) governs review of the special education determinations at issue in the present case. Section 10-76h (d) (4) provides in relevant part that "[a]ppeals from the decision of the hearing officer or board shall be taken in the manner set forth in section 4-183[6] . . . ." Furthermore, "[s]ection 10-76h provides for the administrative review of complaints relating to the classification and placement of children under the [Individuals with Disabilities Education] Act. The administrative proceedings in this case were conducted pursuant to that section. Under the federal statute, 20 U.S.C. § 1415 (1982), the state administrative hearing system must conform to federal procedural standards . . . ." *Dubois* v. *Connecticut State Board of Education,* 727 F.2d 44, 46 n.2 (2d Cir. 1984). "Con-

[6] General Statutes § 4-183 (j) provides: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment."

necticut has chosen to participate in the [Individuals with Disabilities Education Act] and has enacted legislation to implement the Act's requirements. See [General Statutes] § 10-76h." *Mrs. C.* v. *Wheaton*, 916 F.2d 69, 71 (2d Cir. 1990).

I

The plaintiff first claims that the court improperly upheld the award of compensatory education to A rather than determining that the award was barred by laches. Specifically, the plaintiff argues that because the office of protection and advocacy believed that A was eligible for special education services as early as November, 1996, and first raised these concerns in a May, 1997 pupil placement team meeting, the doctrine of laches should have precluded A from recovering compensatory education pursuant to the act during this period. We disagree.

The act is a federal act, and, as such, "we look to the federal courts for guidance in resolving issues of federal law." *Turner* v. *Frowein*, 253 Conn. 312, 340, 752 A.2d 955 (2000). Federal courts apply principles of equity, including the defense of laches, when reviewing claims under the act. See, e.g., *Pihl* v. *Massachusetts Dept. of Education*, 9 F.3d 184, 188–90 (1st Cir. 1993). "The equitable doctrine of laches is an affirmative defense that serves as a bar to a claim for equitable relief where a party's delay in bringing suit was (1) unreasonable, and (2) resulted in prejudice to the opposing party." (Internal quotation marks omitted.) *Murphy* v. *Timberlane Regional School District*, 973 F.2d 13, 16 (1st Cir. 1992). "The burden is on the party alleging laches to establish the defense. . . . Whether a plaintiff has been guilty of laches is an issue of fact for the trier, which cannot be made by an appellate court unless the subordinate facts found make such a conclusion inevitable as a matter of law." (Citation

omitted.) *Castonguay* v. *Plourde*, 46 Conn. App. 251, 265, 699 A.2d 226, cert. denied, 243 Conn. 931, 701 A.2d 660 (1997). Upon review of the relevant findings, we conclude that the plaintiff failed to establish either that there was unreasonable delay or that it was prejudiced by such delay.

The plaintiff argues that the office of protection and advocacy knew of A's eligibility for educational services as early as November, 1996, but failed to raise the issue until the May, 1997 meeting. The hearing officer concluded that he was "unwilling to ascribe [the office of protection and advocacy's] unreasonable delay to A or to inflict consequences for such delay on A's prayer for relief." The court, reviewing this conclusion, stated that "[w]hile [the office of protection and advocacy] did fail to disclose Dr. Rivera's report from November, 1996, until May, 1997, knowing that [A] was probably eligible for special education services, that delay is not attributable to [A] on a laches theory and does not preclude compensatory education. . . . Compliance with the [act] is the responsibility of the school district, not the student."

The plaintiff first argues that the law of agency renders A responsible for any delays attributable to the office of protection and advocacy for educational entitlements. We are not persuaded.

At the outset, we note that the plaintiff was created pursuant to General Statutes § 18-99a "for the education or assistance of any person confined in any institution of the department [of correction]. . . . " Section 18-99a places the responsibility of tending to the educational needs of those incarcerated with the plaintiff. Furthermore, General Statutes § 10-76d (a) (1) requires that "each local or regional board of education shall provide the professional services requisite to identification of school-age children requiring special education, iden-

tify each such child within its jurisdiction, determine the eligibility of such children for special education . . . prescribe suitable educational programs for eligible children, maintain a record thereof and make such reports as the commissioner may require."

The purpose of the act, which is the basis of the Connecticut special education scheme, is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected . . . ." 20 U.S.C. § 1400 (d) (1) (A), (B). The act "confers upon disabled students an enforceable substantive right to public education in participating States . . . ." *Honig* v. *Doe,* 484 U.S. 305, 310, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988). The "primary vehicle" of implementing the act's goals is the individualized educational program. Id., 311. The plaintiff's argument that inactivity on the part of an agency charged with representing a child can cause a child to lose that entitlement does not comport with the purpose of the act, that is, "to ensure that the rights of children with disabilities and parents of such children are protected." The delay is not attributable to A, and the laches defense fails.

The court, in reviewing the plaintiff's laches defense, also stated that "[e]ven if the delay could be attributable to [A] based on an agency theory, [the plaintiff] has failed to demonstrate resultant prejudice. The testimony before the hearing officer established that [the plaintiff] simply was not able to provide a [free and appropriate public education] to [A]. In terms of costs to [the plaintiff] as a ground for prejudice, there would have been costs for providing a [free and appropriate public education] to [A] if done in a timely fashion.

. . . Thus, the plaintiff's laches argument must fail." The court properly concluded that the plaintiff failed to establish prejudice.

In its brief, the plaintiff states that it would have taken the necessary steps had it known of A's entitlement to special education services. "Prejudice by delay in instituting an equitable action is an essential element of laches. . . . Laches in legal significance is not mere delay but delay that works a disadvantage to another." (Citation omitted; internal quotation marks omitted.) *Bahr Corp.* v. *O'Brion*, 146 Conn. 237, 249, 149 A.2d 691 (1959). "The mere lapse of time does not constitute laches . . . unless it results in prejudice to the defendant . . . as where, for example, the defendant is led to change his position with respect to the matter in question." (Internal quotation marks omitted.) *Burrier* v. *Burrier*, 59 Conn. App. 593, 596, 758 A.2d 373 (2000). Since the plaintiff can identify no consequence of the delay, it has failed to establish prejudice.

The decision of the United States Court of Appeals for the First Circuit in *Murphy* v. *Timberlane Regional School District*, supra, 973 F.2d 14, reversing a District Court decision granting a motion for summary judgment on the basis of a defense of laches, is instructive. The court initially stated that "[w]e have been unable to find any cases applying the laches doctrine to a claim brought under the Act, indicating that perhaps the doctrine should be applied sparingly to facilitate Congress' policy concerning the education of children with disabilities." Id., 16. The court held that a six year delay in seeking relief was not unreasonable when attributed to negotiations by the child's parents with a school for adequate services or a misunderstanding as to a child's entitlement to special education beyond the age of twenty-one. Id. Furthermore, the court was troubled by the school district's attempt to place blame on parents for failure to pursue rights under the act when the state

scheme placed the obligation on the school district. Id., 17. We further note that, unlike the situation in *Murphy*, the plaintiff in the present case does not claim that it actually identified A as a special education candidate. It is difficult, therefore, to accept the argument that A failed to resort to the procedural mechanisms for disagreements with a prescribed special education program when, for much of the time at issue, no program was prescribed.

The *Murphy* court similarly rejected arguments that the school district was prejudiced by the six year delay, including arguments that "because [the student] is now over 21 years of age, the state will not reimburse [the school district] for the costs associated with compensatory education; memories of witnesses from the 1981-83 period have faded; most of the principal actors from the 1981-83 period have left the jurisdiction of Timberlane; and in light of the posture of this case, no stay-put provision was in place, and [the student] has been out of any publicly funded educational system since 1989." Id., 17. The court responded that "[t]he laches doctrine may be invoked only where the prejudice to the defendant flows from the plaintiff's delay. . . . Two of the factors relied on by the district court have nothing to do with the [parents'] delay in filing their claim. Although it may be true that the state would not contribute to [the school district's] expenditures on compensatory education, that hardship is not attributable to the parents' delay. If the [parents] had sought and received a compensatory education award in 1984, [the school district] would still be required to bear the cost without assistance from the state. Similarly, any prejudice to [the school district] that might result from the fact that [the student] has been out of school throughout the course of these proceedings is not attributable to the parents' delay. The two remaining factors upon which the district court relied also do not support a grant of

summary judgment. First, there was no evidence before the district court that the memories of witnesses had failed. Second, the district court's finding that key witnesses were unavailable was premature. [The school district] measures unavailability by reference to the subpoena power of the administrative agency." (Citations omitted.) Id., 17–18.

In contrast to *Murphy*, the plaintiff here claims only that it has suffered a delay in acting on A's educational needs. It does not claim any loss of witnesses produced by the delay. We therefore conclude that the court properly found that a laches defense did not preclude the grant of compensatory education.

II

In several remaining claims, the plaintiff argues that the hearing officer made a series of rulings without substantial evidence to support the rulings. Specifically, the plaintiff claims that the hearing officer improperly (1) awarded compensatory education from March 21, 1997, through August 27, 1997, (2) ignored the fact that A was not entitled to compensatory education between March 21, 1997, and August 27, 1997, because A had conceded that he had not regressed during that period, (3) found that the program that was offered to A between March 21, 1997, and August 27, 1997, was inappropriate and (4) awarded compensatory education for the periods of February 20, 1996, to May 2, 1996, and from June 5, 1996, to September 9, 1996.

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or

questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . .

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. General Statutes § 4-183 (j) (5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The United States Supreme Court, in defining substantial evidence in the directed verdict formulation, has said that it is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, supra, 253 Conn. 676–77.

"[A] court's inquiry in suits brought under [the Act] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Hendrick Hudson District Board of Education* v. *Rowley*, 458 U.S. 176, 206–207, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982). With these standards in mind, we review the various substantial evidence claims.

## A

The plaintiff first claims that the award of compensatory education from March 21, 1997, through August 27, 1997, is not supported by substantial evidence. We disagree.

The hearing officer reviewed the evidence presented regarding the time period from March 21, 1997, to August 27, 1997, and concluded that "since there is no evidence in the record to demonstrate that [the plaintiff], during the time periods set forth above, followed the procedural requirements of the [act] or offered a program from which A could derive educational benefit, it is held that [the plaintiff] has failed to satisfy either prong of the [*Rowley*] standard for an appropriate special education program . . . ." We conclude that substantial evidence supports this conclusion.

The plaintiff argues that the following facts controvert the hearing officer's conclusion. The plaintiff did not have the October, 1996 individualized education program, through no fault of its own. Both A and the office of protection and advocacy knew that the plaintiff did not have the relevant individualized education program, and the office of protection and advocacy did not provide the individualized education program to the plaintiff. We find these assertions unpersuasive.

As we stated in part I of this opinion, General Statutes § 18-99a requires that school districts identify students in need of special education. A number of other federal and state provisions impose a similar burden on agencies such as the plaintiff to provide for the special education needs of students within its district. See 34 C.F.R. § 300.343;[7] Regs., Conn. State Agencies § 10-76d-

[7] Title 34, § 300.343, of the Code of Federal Regulations provides in relevant part:

"(a) General. Each public agency is responsible for initiating and conducting meetings for the purpose of developing, reviewing, and revising the [individualized education program] of a child with a disability . . . .

"(b) Initial [individualized education programs]; provision of services.

6;[8] Regs., Conn. State Agencies § 10-76d-13;[9] Regs.,

"(1) Each public agency shall ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child—

"(i) The child is evaluated; and

"(ii) If determined eligible under this part, special education and related services are made available to the child in accordance with an [individualized education program].

"(2) In meeting the requirement in paragraph (b) (1) of this section, a meeting to develop an [individualized education program] for the child must be conducted within 30-days of a determination that the child needs special education and related services. . . ."

[8] Section 10-76d-6 of the Regulations of Connecticut State Agencies provides: "Each board of education is responsible for the identification of children requiring special education and related services. This responsibility shall include cooperating with other agencies in a position to identify children requiring special education and related services. Determination of a child's eligibility to receive special education and related services shall be based on documented evidence, as required by these regulations, that the child requires special education."

[9] Section 10-76d-13 of the Regulations of Connecticut State Agencies provides:

"Special education and related services shall be provided as soon as possible after the planning and placement team meeting held to review, revise or develop the child's individualized education program, but in any event not later than the following timelines.

"(a) School year. In the case of a referral made during the academic year, the timelines shall be as follows.

"(1) The individualized education program shall be implemented within forty-five days of referral or notice, exclusive of the time required to obtain parental consent.

"(2) In the case of a child whose individualized education program calls for out-of-district or private placement, the individualized education program shall be implemented within sixty days of referral or notice, exclusive of the time required to obtain parental consent. If difficulty of placement is such as to occasion a delay beyond this period, the board of education shall submit to the state board of education written documentation of its efforts to obtain placement in a timely manner.

"(3) Notice shall be sent to the parents in accordance with the requirements of Section 10-76d-8 of these regulations.

"(4) Where necessary, parental consent shall be given within ten days of the date of notice or, where appropriate, of the date of the planning and placement team meeting in which the parents participated. Consent shall be as specified in Section 10-76d-8 of these regulations.

"(5) Notice of a planning and placement team meeting to develop, review or revise the child's individualized education program shall be sent to the

Conn. State Agencies § 10-76d-14.[10]

Under the express language of those provisions, the plaintiff's argument that it was not responsible must fail. The March 21, 1997 telephone call from the department of children and families put the plaintiff on notice that the plan existed. At that point, it was incumbent on the plaintiff to retrieve the plan.

The plaintiff further argues that, pursuant to federal regulations, the court improperly concluded that it was required to implement the October, 1996 plan on the day that it had received notice from the department of children and families, contrary to federal and state regulations that afford various time periods for implementations of plans. This argument overlooks the fact that, from February, 1996, to March, 1997, A was incarcerated at the center. Although the volume of short-term residents may be daunting, this factor does not relieve the plaintiff from the burden of upholding the right of a special education student to a free and appropriate public education. See *Alexander S.* v. *Boyd*, 876 F. Sup. 773, 801–802 (D.S.C. 1995).[11]

---

parents in accordance with Section 10-76d-12 (c) of these regulations.

"(6) A full copy of the individualized education program shall be sent to the parents within five days after the planning and placement team meeting to develop, review or revise the individualized education program.

"(b) Between school years. In the case of a referral made in between school years, the effective date of the referral may be deemed to be the first school day of the next school year."

[10] Section 10-76d-14 of the Regulations of Connecticut State Agencies provides in relevant part: "Each board of education shall provide each child requiring special education and related services with a program appropriate to the child's needs as set forth in the child's individualized education program. . . ."

[11] The court in *Alexander S.* v. *Boyd,* supra, 876 F. Sup. 801–802, addressed the same issue in the context of juvenile facilities in which over 2000 juveniles would pass through the institution per year, staying an average of twenty-one days but no longer than forty-five days. The court stated that the obligation to screen juveniles and, if necessary, to create a new individualized training plan commenced upon assignment to the institution. The court further noted the various obstacles present in the transfer of juvenile education records.

The court in that case contacted the United States Department of Educa-

## B

The plaintiff next argues that the conclusion of the court that A was entitled to compensatory education from May, 1997, to August, 1997, is not supported by substantial evidence because A conceded that he had not regressed from the academic level he maintained while at Riverview. We disagree.

The court found the plaintiff's assertion that the hearing officer ignored A's concession that he had not regressed "unavailing." Testimony was provided that A had relapsed into a pattern of self injury. The plaintiff presented evidence that pointed to sustained levels of performance in mathematics and reading in support of its argument that A had not regressed to previous academic levels.

This argument misapprehends the role of regression in the analysis of violations of the act. Regression is considered when a court reviews the adequacy of the individualized education program. See *Burilovich* v. *Board of Education*, 208 F.3d 560, 571 (6th Cir. 2000). "[F]or an [individualized education program] to be reasonably calculated to enable the child to receive educational benefits . . . it must be likely to produce progress, not regression . . . ." (Citations omitted; internal quotation marks omitted.) *M.S. ex rel. S.S.* v. *Board of Education*, 231 F.3d 96, 103 (2d Cir. 2000). The regression argument is not relevant to the analysis

tion for a potential solution. The department replied in a memorandum in which it concluded that: "In the case of short-term, temporary confinement, the State may meet its obligation under [the Individuals with Disabilities Education Act] and Section 504 . . . by implementing the [individualized education program] from the previous school district or placement instead of developing a new one. The [individualized education program] must be implemented to the extent possible in the temporary setting. To the extent the implementation of the old [individualized education program] is impossible, services that approximate, as close as possible, the old [individualized education program] must be provided." (Internal quotation marks omitted.) Id., 802.

of education given a student in the absence of an individualized education program.

A stated objective of the act is to provide special education students with "a free and appropriate public education." The act defines a "free appropriate public education" as a "special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) *are provided in conformity with [an] individualized education program.*" (Emphasis added; internal quotation marks omitted.) *School Committee* v. *Massachusetts Dept. of Education*, 471 U.S. 359, 367–68, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985). The United States Supreme Court has stated that "[a]lmost as a checklist for adequacy under the Act, [a free and appropriate public education] also requires that . . . instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and *comport with the child's [individualized education program].*" (Emphasis added.) *Hendrick Hudson District Board of Education* v. *Rowley*, supra, 458 U.S. 189. The plaintiff cannot point to any evidence of an individualized education program complying with the strictures of an individualized education program as delineated in § 10-76d-11 of the Regulations of Connecticut State Agencies.[12] The plaintiff

---

[12] Section 10-76d-11 of the Regulations of Connecticut State Agencies, governing individualized education programs, provides: "Each board of education shall establish policies and procedures for developing, implementing, reviewing, maintaining and evaluating an individualized education program for each child requiring special education and related services. The individualized education program shall be based upon the diagnostic findings of the evaluation study. The planning and placement team shall base recommendations for any changes in a child's individualized education program upon the child's current individualized education program and any information relating to the child's current educational performance.

cites to no legal authority that affords it the option of implementing a program under alternate criteria that would satisfy the requirements of § 10-76d-11.

Even if such a program were possible, "the educational benefit to which the Act refers and to which

"(a) Development or revision. Each planning and placement team shall develop, or revise, whichever is appropriate, the individualized education program for each child requiring special education and related services prior to the beginning of the school year. In the case of a student enrolled after the last day of the previous school year, this process shall be completed by October first of the school year.

"(b) Review. Each planning and placement team shall review and, if appropriate, revise each child's individualized education program periodically but not less than annually. In addition, a review shall be made upon request of the parents or personnel working with the child, provided the child's educational performance indicates the need for a review.

"(c) Components. Components of the individualized education program shall include the following.

"(1) A statement of the child's present level of educational performance, including, where appropriate, academic achievement, social adaptation, prevocational and vocational skills, psychomotor skills and self-help skills;

"(2) A statement of annual educational goals for the school year under the child's individualized educational program;

"(3) A statement of short-term instructional objectives derived from the annual educational goals. This shall include objective criteria, evaluation procedures and schedules for determining, on a regular basis, whether the short-term instructional objectives are being achieved;

"(4) A statement of specific educational services needed by the child, including a description of special education and related services which are needed to meet the needs of the child. Such description shall include the type of transportation necessary and a statement of the recommended instructional settings;

"(5) The date when those services will begin and length of time the services will be given with the length of the school day and school year needed to meet the child's special education needs, including criteria to determine when services will no longer be needed;

"(6) A description of the extent to which the child will participate in the regular education program. This shall include a description of how the regular education program will be modified to meet the child's needs;

"(7) A list of the individuals who shall implement the individualized education program; and

"(8) In the case of a residential placement, whether such placement is being recommended because of the need for services other than educational services.

"(d) Individualized education program form. Each board of education

an [individualized education program] must be geared cannot be a mere modicum or de minimis; rather, an [individualized education program] must be likely to produce progress, not regression or trivial educational advancement. In short, the educational benefit that an [individualized education program] is designed to achieve must be meaningful." (Internal quotation marks omitted.) *Houston Independent School District* v. *Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000). Because the plaintiff failed to generate a new individualized education plan or to implement the October, 1996 plan, the court's conclusion that the plaintiff failed to provide A with a free and appropriate public education pursuant to the act is supported by substantial evidence.

C

The plaintiff further claims that the court improperly concluded without substantial evidence that the program offered to A between May, 1997, and August, 1997, was not appropriate. We are not persuaded.

The United States Department of Education has interpreted the act to require each public agency to "(1) Provide special education and related services to a child with a disability in accordance with the child's [individualized education program]; and (2) Make a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the [individualized education program]." 34 C.F.R. § 300.350 (a).

The plaintiff specifically claims that the decision of the hearing officer was improper because the education provided "conferred some educational benefit to A" and he progressed in the areas of mathematics and reading. As indicated in part II of this opinion, the act requires more than an improvement in some subject areas; see, e.g., *Houston Independent School District*

shall use a standardized individualized education program form. Said form shall be subject to the approval of the state board of education."

v. *Bobby R.*, supra, 200 F.3d 350 (once plan implemented, act does not mandate improvement in every subject area); it requires implementation of a program tailored to the special needs of the student, which is not evidenced in the present case. As such, the decision of the court is supported by substantial evidence.

### D

The plaintiff further claims that the conclusion that A was entitled to compensatory education for the periods of February 20, 1996, to May 2, 1996, and from June 5, 1996, to September 9, 1996, is not supported by substantial evidence. We disagree.

The plaintiff again relies on § 10-76d-13 of the Regulations of Connecticut State Agencies for the proposition that the district is allowed forty-five days, exclusive of obtaining parental consent, to implement an individualized education plan. The fact that a plan must be implemented within forty-five days does not bar an entitlement to an education during that period. The forty-five day time limit imposed by the act requires state defendants to provide timely hearing determinations. *Lillbask ex rel. Mauclaire* v. *Sergi*, 117 F. Sup. 2d 182, 189 (D. Conn. 2000). This provision imposes a procedural requirement on the state to ensure access to an education within a reasonable time period, not an elimination of the student's substantive right to a free and appropriate public education during that forty-five day period.

Similarly, General Statutes § 10-76d requires the identification of those entitled to special education services irrespective of procedural timelines, precluding a denial of benefits as a result of such timelines. "The statutory definition of 'free appropriate public education,' in addition to requiring that States provide each child with 'specially designed instruction,' expressly requires the provision of 'such . . . supportive services . . . as

may be required to assist a handicapped child to benefit from special education.' [20 U.S.C.] § 1401 (17). . . . We therefore conclude that the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Hendrick Hudson District Board of Education* v. *Rowley,* supra, 458 U.S. 201. The conclusion of the court that A is entitled to compensatory education is supported by substantial evidence.

## III

The plaintiff further claims that the court improperly upheld the award for compensatory education notwithstanding the finding that A was incompetent. We disagree.

The fact that A was declared incompetent in criminal proceedings has no bearing on whether he is competent for purposes of civil matters, since declarations of civil and criminal competence arise out of different proceedings and involve different standards. Under General Statutes § 54-56d (2), a party raising the issue of competence must establish that the defendant is *not competent to stand trial by a preponderance of the evidence.* In contrast, "our provisions for civil commitment; see General Statutes § 17a-498 (c); and for conservatorship proceedings, which govern the appointment of a conservator of the person for an individual incapable of caring for himself or herself; see General Statutes § 45a-650 (c); require proof by *clear and convincing evidence* . . . ." (Emphasis added.) *State* v. *Garcia,* 233 Conn. 44, 87–88, 658 A.2d 947 (1995). It would be unreasonable for the court to equate criminal incompetence with civil incompetence, given the disparate standards. See *In re Valerie D.,* 223 Conn. 492, 533–34, 613 A.2d 748 (1992). The court properly rejected the

argument that criminal incompetence should be considered in an award of compensatory education.

IV

The plaintiff finally claims that the court improperly ordered it to hold a pupil placement team meeting for A within forty-five days of the issuance of the decision in light of the uncertainty surrounding the release of A from Connecticut Valley Hospital. We disagree.

The plaintiff appears to speculate that A may remain institutionalized beyond the forty-five days granted to it by the court for convening a pupil placement team meeting. We will not reverse the decision of the court on the basis of speculation that compliance may not be possible due to some future occurrence.

The plaintiff, alternatively, may be arguing that it is uncertain regarding the actions that must be taken. "A judgment must so dispose of the matters in issue that the parties and other persons affected will be able to determine with reasonable certainty the extent to which their rights and obligations have been determined." *Contegni* v. *Payne*, 18 Conn. App. 47, 59, 557 A.2d 122, cert. denied, 211 Conn. 806, 559 A.2d 1140 (1989). The order sufficiently describes the actions to be taken by the plaintiff, and, should the occasion arise in which compliance is not possible, adequate safeguards are accorded the plaintiff. See *Eldridge* v. *Eldridge*, 244 Conn. 523, 532, 710 A.2d 757 (1998) (" '[t]he inability of a party to obey an order of the court, without fault on his part, is a good defense to the charge of contempt' "). The court, therefore, properly rendered its order.

The judgment is affirmed.

In this opinion the other judges concurred.