## In Re C.S.

### No. 00–FS–1153.

District of Columbia Court of Appeals.

Argued Nov. 9, 2001.
Decided Aug. 1, 2002.

---

Marion E. Baurley, Washington, for appellant.

Sidney R. Bixler, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Rosalyn Calbert Groce, Supervisory Corporation Counsel, were on brief, for appellee.

Before SCHWELB, REID, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

In this juvenile delinquency case,[1] C.S. asserts that because the trial court entered a disposition[2] on August 30, 2000, prior to

---

1. The term juvenile delinquent means "a child who has committed a delinquent act and is in need of care or rehabilitation." D.C.Code § 16-2301(6) (1996).

2. In the juvenile delinquency system, disposi-

the completion of an Individualized Education Program (IEP),[3] the determination of the trial court should be vacated. Specifically, C.S. argues that an IEP was required by the Individuals with Disabilities Education Act (IDEA);[4] the spirit of the juvenile justice laws;[5] and the trial court's order, making the disposition of C.S.'s case improper prior to the completion of an IEP. Because none of these reasons compel the trial court to consider an IEP before entering a disposition, there is no basis for this court to set aside the disposition order and accordingly, we affirm.

## Facts

At the age of fifteen, C.S. was arrested on March 19, 1999, at Hamilton Alternative School, with a large butcher knife in her handbag. C.S. brought the butcher knife to school to threaten a classmate.

C.S. plead responsible for possessing a prohibited weapon. *See* D.C.Code § 22–3214(b) (1994). As a result, C.S. was placed on probation for one year. C.S. then violated the conditions of her probation and her probation was revoked on April 24, 2000. According to the record, C.S.'s probation was revoked because she failed to keep scheduled appointments with her probation officer; failed to maintain satisfactory attendance at school; did not adhere to her court ordered curfew; continued to use illegal drugs; and neglected to take her medication.

On April 25, 2000, the trial court ordered both a psychiatric evaluation and a psychological evaluation be performed on C.S., and the results were provided to the trial court. On July 11, 2000, the trial court ordered the treatment team working with C.S. to submit a treatment plan, rec-

---

tion is a euphemism for sentencing, and is used to honor the non-criminal character of the proceedings. *See* D.C.Code § 16–2320 (1997).

**3.** An IEP is defined as:

(A) a written statement for each child with a disability that is developed, reviewed, and revised ... and that includes(i)—a statement of the child's present level of educational performance, including—(I) how the child's disability affects the child's involvement and progress in the general curriculum .... (ii) a statement of measurable annual goals, including benchmarks or short-term objectives, related to—(I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and (II) meeting each of the child's other educational needs that result from the child's disability (iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—(I) to advance appropriately toward attaining the annual goals; (II) to be involved and progress in the general curric-

ulum in accordance with clause (i) and to participate in extracurricular and other non-academic activities; and (III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph; (iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in clause (iii); (v)(I) a statement of any individual modifications in the administration of State or district wide assessments of student achievement that are needed in order for the child to participate in such assessment; and (II) if the IEP Team determines that the child will not participate in a particular State or district wide assessment of student achievement (or part of such assessment), a statement of—(aa) why the assessment is not appropriate for the child; and (bb) how the child will be assessed; (vi) the projected date for the beginning of the services and modifications described in clause (iii), and the anticipated frequency, location, and duration of those services and modifications.... 20 U.S.C. § 1414(d).

**4.** 20 U.S.C. §§ 1400 *et seq.*

**5.** D.C.Code §§ 16–2301 *et seq.* (Repl.1997).

ommending a proper disposition for C.S., and any other results by July 26, 2000. The trial court, in the same order, asked that an IEP be completed. A treatment plan was supplied to the trial court but it did not include an IEP. On August 30, 2000, the disposition judge entered an order, without an IEP, committing C.S. to the custody of the Department of Human Services (DHS) until she reached the age of 21, and directing that she be placed at Woodside Hospital.[6]

The trial court selected Woodside Hospital as C.S.'s residential placement because C.S.'s needs are many fold. C.S. has a protein deficiency, and she has developed a blood clot and is required to take blood thinning medication. This presents the risk of C.S. being more susceptible to serious harm if injured on the one hand, and at serious risk for sending a clot to her lung, brain, or heart if she does not take the medicine as prescribed, on the other hand. In addition, C.S. has threatened suicide on more than one occasion and has attempted to run away. On the occasions that C.S. has run away, C.S. claims to have stayed with older men. C.S. has a history of sexual promiscuity. Moreover, with C.S. carrying knives, the trial court rationally believed that C.S. not only put herself at risk of harm but also put others at risk as well. In fact, C.S., in a discussion with a staff member at Woodside Hospital, disclosed a past incident where she threatened a peer with a firearm due to a disagreement about a boy.

### Analysis

C.S. first asserts that the trial court ignored federal law by failing to ensure that her statutory rights under IDEA were recognized and protected during her disposition. C.S. contends that because the trial court did not follow the steps delineated by the IDEA, it is not possible that she will receive the appropriate educational benefits at her residential placement. We disagree.

Contrary to the assertions by C.S., the IDEA, a federal program, does not purport to dictate to States how they must run their juvenile justice system. The IDEA is an education statute that provides funding to States "to ensure that all children with disabilities have available to them a free appropriate education" that emphasizes their unique needs. 20 U.S.C. § 1400(d) (1997). The IDEA is administered in the District of Columbia by the District of Columbia Public School System (DCPS). *See* D.C.Code § 31–1861(a) (1999).[7] DCPS is ultimately responsible for ensuring that all children with disabilities in the District of Columbia "receive a free appropriate education in accordance with IDEA." *Petties v. District of Columbia*, 894 F.Supp. 465, 466 (D.D.C.Cir.1995); *see* 20 U.S.C. § 1412(a) (1997). The regulations discussing state eligibility under IDEA explain that DCPS is required to ensure that an IEP is developed for each child with a disability. *See id.* at § 1412(4) (1997). However, nothing in the IDEA requires that an IEP be created or reviewed prior to entering a disposition in a juvenile delinquency case. *See In re J.J.*, 431 A.2d 587, 593 n. 16 (D.C.1981).

The sole judicial remedy provided for by the IDEA is a civil suit, which may only be

---

**6.** From the record, it appears that an IEP was completed prior to the date C.S. was admitted at Woodside Hospital. C.S. was transported from Oak Hill, her interim placement, to Woodside Hospital on October 24, 2000. An IEP was completed on October 23, 2000.

**7.** "The District of Columbia Public Schools (DCPS) shall assess or evaluate a student, who may have a disability and who may require special education services...." D.C.Code § 31–1861(a) (1999).

brought subsequent to an administrative hearing before the local education board. *See* 20 U.S.C. § 1415 (1995); *see also In re J.A.G.*, 443 A.2d 13, 17 (D.C.1982). Congress intended that those with claims under the IDEA "pursue those claims through the carefully tailored administrative and judicial mechanism set out in the statute." *Bonar v. Ambach*, 771 F.2d 14, 18 (2d Cir.1985). Accordingly, the proper course of action for an aggrieved parent or child under IDEA is to bring an action against the state educational agency. *See id.* at § 1415 (1997).

Similar to the IDEA, our Juvenile delinquency laws do not require that an IEP be completed before a juvenile disposition order is entered. *See* D.C.Code §§ 16–2301 *et seq.* (Repl.1997). Our juvenile justice laws merely require that "the Division [shall] direct that a pre-disposition study and report to the Division be made by the director of Social Services or a qualified agency designated by the Division concerning the child." D.C.Code § 16–2319 (1995); *see* Super. Ct. Juv. R. 32(b); *see also In re M.C.S.*, 555 A.2d 463, 464 (D.C. 1989).

In this case, a pre-disposition report was ordered and considered by the trial court before the disposition order was entered. C.S. does not challenge the contents of the report nor cite to any infirmity in the preparation of the report that would require that the disposition be vacated.[8] Accordingly, we discern no error in the procedure followed by the trial court and conclude that the trial judge's decision to enter a disposition order in C.S's case prior to reviewing an IEP was not an abuse of discretion or otherwise improper.

In reaching this conclusion, we do not mean to suggest nor imply that a trial judge may not or, in some cases, should not require that an IEP be developed prior to disposition if he or she deems it appropriate. However, the failure to order such a report does not, as a matter of law, render a subsequent disposition improper.[9]

C.S. next contends that the trial judge abused her discretion because she could not have crafted a disposition that was in C.S.'s best interest without knowing her exact educational needs. Specifically, C.S. argues that by entering a disposition order without the benefit of an IEP, the trial court ignored her educational needs, "which were the primary cause of her defiant behavior."

Our precedent "requires that the juvenile court do what is best for the

---

8. Possible infirmities may be the failure to include information concerning C.S.'s "characteristics, family, environment, ... [or] the circumstances affecting [C.S.'s] behavior." Super. Ct. Juv. R. 32(b)(2).

9. After entering the disposition order in this case, the completed IEP was apparently submitted to the trial judge for her review soon after C.S. was transferred to Woodside Hospital. Interestingly, C.S. did not contend on appeal that the type of educational services that were identified in the IEP could not be provided for her at Woodside Hospital. Instead C.S. suggests that the IEP was flawed because DCPS did not follow appropriate procedures in developing her plan. This challenge by C.S. to the validity of the IEP, after the trial judge waited months for DCPS to finish the report, points out why waiting for an IEP to be developed may not always be time well spent. Assuming for the sake of argument that C.S.'s allegations are correct and that DCPS did not follow the appropriate procedures when creating an IEP. C.S. has not lost the right to request that a valid IEP be created. If, after the appropriate civil hearings are held, it is found that C.S.'s statutory rights were violated with regard to the IEP conducted on October 23, 2000, a valid IEP can be conducted while she is at Woodside Hospital. Consequently, the failure to use an IEP, in conjunction with other available evaluations, does not require this court to vacate C.S.'s disposition.

child's care so long as [that] ... disposition provides adequate protection for society." *In re L.J.*, 546 A.2d 429, 437 (D.C. 1988); *see Rice v. District of Columbia,* 128 U.S.App. D.C. 194, 196, 385 F.2d 976, 977 (1967) (explaining that in a juvenile disposition we must balance the interests of the community and the welfare of the child). In making a disposition the trial court may consider the "safety of the community as well as the juvenile's needs," and an informed exercise of discretion will rarely be disturbed on appeal. *In re L.J., supra,* 546 A.2d at 438.

C.S. can cite to no authority for her proposition that the lack of an IEP renders a best interest analysis insufficient as a matter of law. This court has long held that disposition hearings are the juvenile equivalent of adult sentencing proceedings. *See In re T.L.J.,* 413 A.2d 154, 158 (D.C.1980). "When the trial court rules in such a proceeding within the limitations established by statutes, it is not our function to review that exercise of discretion." *In re L.J., supra,* 546 A.2d at 435.

In this case, C.S. was found to be involved in a delinquent act and was committed to DHS. C.S. was not committed solely for educational reasons. C.S. carried a butcher knife to school with less than altruistic motives. If C.S. had not been stopped before she could brandish and use her weapon, this could be an entirely different case, perhaps one for assault or even murder. Additionally, C.S. has admitted to unsafe practices that extend well beyond her need for a "free appropriate education." The trial judge noted that C.S. was in need of a disposition that could best handle her unique medical situation as well as any psychological problems. Under these circumstances, it was not an abuse of discretion for the trial judge to reasonably conclude that a residential placement not only provided adequate protection for society but was best for C.S.'s overall care.

It is worth noting that the trial judge was very thorough in her approach to this case and did concern herself with C.S.'s educational needs. In addition to ordering and reviewing psychological and psychiatric tests prior to ruling on C.S.'s disposition, the trial court also ordered and reviewed reports from C.S.'s mental health specialist, cosmetology teacher, reading teacher, business teacher, and a correctional officer. While an IEP would no doubt have provided an even greater degree of substantive information about C.S's educational needs, we believe the trial judge was sufficiently acquainted with C.S's educational needs to make an informed dispositional decision. Moreover, the record reveals that C.S. is thriving at Woodside Hospital. A reporting social worker writes that "C.S. has adjusted well to the facility. C.S. reports that she is okay with being at Woodside and has no wish to return to Oak Hill. She requested that the [social] worker forward this to the court and her attorney."

The Juvenile Code requires that the court "do what is best for the child's care so long as this disposition provides adequate protection for society." *In re L.J., supra,* 546 A.2d at 437. The disposition in this case, was clearly designed to achieve that goal and, therefore, appellant's argument that the trial court disregarded the spirit of the Juvenile Code by imposing the disposition prior to the completion of an IEP, is without merit.

Finally, C.S. argues that the trial court's order of August 30, 2000, should be vacated because the trial court ordered that an IEP be completed, yet disposed of the case prior to its completion. C.S. contends that the trial court abdicated its responsibility to her when it took no action to enforce its order that an IEP be completed. C.S.

further asserts that without the IEP any disposition would be based upon an uninformed factual foundation.

■ Beyond the pre-disposition report mandated by D.C.Code § 16–2319 (1995), the trial court has broad discretion to choose what information it will consider in making its determination. *See In re L.J., supra,* 546 A.2d at 435. As we have already stated, the trial court performed an exhaustive review of reports and evaluations prior to making a disposition. As such, it was not error for the trial court to make a determination prior to the completion of an IEP.

Moreover, as an unfortunate fact of our over burdened educational system, IEPs often take months to be completed. In many instances placement centers, which have limited openings, may close their doors to a juvenile in need of care and supervision because the space has been filled in the interim. If there is an extended hold on disposition, juveniles in need of care and supervision may often find themselves stuck in limbo waiting for a proper placement. Indeed, some may argue that a failure to place a juvenile in a suitable rehabilitative environment while waiting for an IEP, which could be completed after disposition, is an abuse of discretion. In this case, if an IEP determines that Woodside Hospital is an inadequate facility to handle C.S.'s educational needs, the trial court has the authority to lift its restriction so that C.S. may be placed in a more suitable facility.

■ While education is clearly a component of any best interest of the child analysis conducted in a juvenile proceeding, it is the whole child for whom the trial judge must find the best care and supervision. *See In re L.J., supra,* 546 A.2d at 437. In this case, C.S.'s needs are more wide reaching than simply her educational needs, and because the trial court balanced

C.S.'s many needs and the interest of the community, we are convinced that the trial court made an informed dispositional choice when she placed C.S. at Woodside Hospital.

Accordingly, the judgment of the trial court is

*Affirmed.*

REID, Associate Judge, concurring:

I agree with the majority that the judgment of the trial court should be affirmed. I write separately, however, to emphasize the importance of Judge Combs Greene's efforts to ensure compliance with the IDEA within the setting of the juvenile justice system. Although there was delay in obtaining the IEP for C.S. prior to her transfer to Woodside Hospital, nonetheless, the IEP was in place prior to her transfer. Yet, instead of stressing that Judge Combs Greene's July 11, 2000, court order requiring an IEP assessment for C.S. was consistent with the law, the majority opinion states that: "[N]othing in the IDEA requires that an IEP be created or reviewed prior to entering a disposition in a juvenile delinquency case."

Respectfully, I believe that this statement and others in the majority opinion give the wrong signal, not only because they may be misread to say that any effort to fashion an IEP within the context of a delinquency hearing is legally inappropriate, but also because it ignores both the critical importance of, and the legal requirement for, special education for delinquent children, and concomitantly, the nexus between delinquency and the need for special education. *See* Peter E. Leone, et al., *Understanding the Overrepresentation of Youths With Disabilities in Juvenile Detention,* 3 D.C. L.Rev. 389 (1993); Special Education Advocacy Under the Individuals with Disabilities Education Act

(IDEA) FOR CHILDREN IN THE JUVENILE DELINQUENCY SYSTEM (Joseph B. Tulman & Joyce A. McGee, eds., 1998). Such statements also may dissuade judges, like Judge Combs Greene in this case, from following the recommendations of diligent and skilled professionals, who recognize that critical special education needs of a delinquent and psychologically troubled child with medical problems may not be met in a timely fashion, if one is compelled to await the filing and resolution of a civil action to enforce the right to an IEP. *See Unified Sch. Dist. No. 1 v. Connecticut Dep't of Educ.,* 64 Conn.App. 273, 780 A.2d 154, 163–65 (2001) (Delay in the receipt of the IEP should not defeat the child's entitlement to it), *certification for appeal denied,* 258 Conn. 910, 782 A.2d 1253 (2001).

All children with special needs, as in C.S.'s case, must be given "a free appropriate public education that emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(d)(1)(A) (2000); 300 C.F.R. § 300.1 (2001). This includes children who are in local juvenile correctional facilities in jurisdictions, including the District of Columbia, that receive funds under the IDEA. 34 C.F.R. § 300.2(b)(1)(iv); 20 U.S.C. §§ 1401(27), and 1411 (2000). The July 11, 2000, order issued by Judge Combs Greene, requiring an "IEP Assessment to be completed," is consistent with this legal requirement, and is traceable, in part, to the recommendation of Patrice Young, C.S.'s probation officer who attended the July 11, 2000, disposition hearing. In discussing C.S.'s case and efforts to find an appropriate placement for her, Ms. Young stated, in part:

I understand that C. is making progress at Oak Hill in terms of stabilization, ... the staff [members] speak highly of her, they say she's adjusting w[e]ll without incident, she spends a lot of time ... to herself, she keeps a journal, she's focusing on her own short term goals, and they're extremely impressed. I would also ask Your Honor to issue an order for an educational assessment to be initiated at Oak Hill....

Judge Combs Greene's July 11 order continuing the disposition hearing, reflected not only informed sensitivity to C.S.'s needs and the concerns of C.S.'s mother, but also her awareness of the importance of the legally required IEP:

I think C. needs assistance and she's apparently getting it, she's apparently cooperating in it and I don't see why we should at this point cut that off.... I haven't made up my mind about anything, but I do think it's worth[ ]while for you to be interviewed, and it may be that a residential placement for a little while would be appropriate, I don't know.... [Y]ou may be upset about remaining at Oak Hill for now, but you are making progress and that is good, and so I think that that's probably where you ought to stay for now. And I will order an education assessment be done by Oak Hill and that C. cooperate in her transportation and Ms. S.[,C.S.'s mother], if you can attend the interviews, I think that would be helpful. I know your work schedule is [tough], and I know you've devoted a lot of time to coming to court, but if you can attend the interviews then it would be helpful.

Subsequently, Ms. Young and another person submitted a report to the trial court relating to C.S.'s court-ordered IEP. The report stated, in part:

On July 11, 2000, Your Honor issued a court order for an educational assessment to be completed at Oak Hill. According to Dr. Glaspell (staff psychologist), a careful review of previous report and interview of ... the respondent, indicates the need for an Individualized

Education Program. Dr. Glaspell reports being able to complete an IEP before August 10, 2000.

When the disposition hearing continued on August 23, 2000, Ms. Young was not the probation officer in attendance. As Judge Combs Greene sought to sort through the disposition options—probation or residential placement, and the most appropriate facility in the event of residential placement—none of the parties present mentioned the outstanding, court-ordered IEP assessment.

One week later, on August 30, 2000, the parties again assembled. Despite the opposition of both C.S. and her mother, Judge Combs Greene expressed the view that a residential placement was the best option for C.S. Clearly uppermost in the judge's mind were the medical needs of C.S. Thus, she inquired of the attorneys, probation officer, and social worker, all of whom were present:

> Here's my question ..., are the concerns that were raised by Devereaux [a facility in Florida,] with regard to C.'s medical condition and the reason that they thought they would not be ... an appropriate placement, are we satisfied that Woodside can address those needs, because I don't want to send her anyplace where her medical needs can not be met adequately.

After hearing from the parties in response to her question, Judge Combs Greene addressed C.S. and her mother, asking for their cooperation despite their disagreement with the placement at Woodside Hospital, referring to C.S. as "a very intelligent young woman," and specifying that if the placement does not work out, the court will "reevaluate where we are." The trial judge asked C.S.: "Is that fair enough even though you're not happy with that?" C.S. responded: "Yes." None of the parties present mentioned the court-ordered IEP assessment.

What happened between August 30, 2000, and October 24, 2000, to delay C.S.'s transfer to Woodside Hospital is not altogether clear from the record before us. Nonetheless, in opposing C.S.'s October 23, 2000, Emergency Motion for Stay and Reconsideration of Disposition Order on October 31, 2000, the government asserted: "On October 23, 2000, D.C. Public School[s] [DCPS] informed DHS they had completed the respondent's IEP, allowing DHS to place respondent the next day." As the majority opinion recognizes, C.S. was not transferred to Woodside until after C.S.'s court-ordered IEP assessment was available.

Thus, despite the delay, C.S.'s case illustrates that a legally-required IEP can be prepared during a pending delinquency matter, with the cooperation of the court, probation and social workers, and the DCPS. I see no reason to discourage this process by emphasizing that "[t]he sole judicial remedy under the IDEA is a civil suit ...."; and that: "The IDEA states nothing about the obligation of the juvenile justice system to review or create an IEP before ordering a disposition in a juvenile delinquency case." The short answer to this position is that nothing in the IDEA precludes a judge from taking steps to make certain that an IEP is in place prior to disposition. Given the importance of education, and the known link between delinquency and special education needs, such steps clearly are consistent not only with the best interests of the child, but also with the IDEA which applies to children who are in local juvenile correctional facilities in jurisdictions, including the District of Columbia, that receive funds under that Act.